[No. C000306. Third Dist. May 22, 1987.]

GENEVA MAE NORTHRUP et al., Petitioners, v.
THE SUPERIOR COURT OF MODOC COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

**COUNSEL**

Mackenroth, Seley & Anwyl and David E. Mackenroth for Petitioner.

No appearance for Respondent.

John K. Van de Kamp, Attorney General, Michael T. Garcia and Maureen S. Dunn, Deputy Attorneys General, for Real Party in Interest.

## OPINION

**CARR, Acting P. J.**—Petitioners Geneva Northrup and Julia Young were charged by information with practicing midwifery without the proper certification. (Bus & Prof. Code, §§ 2052, 2053, 2505.)[1] After the trial court denied their motion to set aside the informations, petitioners each sought a writ of prohibition. We issued an alternative writ to permit review and resolution of the issues presented.[2] Petitioners contend, inter alia, (1) their conduct was not regulated by statute and (2) they are exempted from the certification requirements under the "religious practice exemption." (§ 2063.) The latter contention is meritorious and we shall grant the requested relief.

---

[1]All further statutory references are to the Business and Professions Code unless otherwise indicated.

Section 2052 provides: "Any person who practices or attempts to practice, or who advertises or holds himself or herself out as practicing, any system or mode of treating the sick or afflicted in this state, or who diagnoses, treats, operates for, or prescribes for any ailment, blemish, deformity, disease, disfigurement, disorder, injury, or other physical or mental condition of any person, without having at the time of so doing a valid, unrevoked or unsuspended certificate as provided in this chapter, or without being authorized to perform such act pursuant to a certificate obtained in accordance with some other provision of law, is guilty of a misdemeanor."

Section 2053 provides: "Any person who willfully, under circumstances or conditions which cause or create risk of great bodily harm, serious physical or mental illness, or death, practices or attempts to practice, or advertises or holds himself or herself out as practicing, any system or mode of treating the sick or afflicted in this state, or diagnoses, treats, operates for, or prescribes for any ailment, blemish, deformity, disease, disfigurement, disorder, injury, or other physical or mental condition of any person, without having at the time of so doing a valid, unrevoked, or suspended certificate as provided in this chapter, or without being authorized to perform such act pursuant to a certificate obtained in accordance with some other provision of law, is punishable by imprisonment in the county jail for not exceeding one year or in the state prison. [¶] The remedy provided in this section shall not preclude any other remedy provided by law."

Section 2505 authorizes the practice of midwifery and defines it: "The certificate to practice midwifery authorizes the holder to attend cases of normal childbirth.

"As used in this chapter, the practice of midwifery constitutes the furthering or undertaking by any person to assist a woman in normal childbirth, but it does not include the use of any instrument at any childbirth, except such instrument as is necessary in severing the umbilical cord, nor does it include the assisting of childbirth by any artificial, forcible, or mechanical means, nor the performance of any version, nor the removal of adherent placenta, nor the administering, prescribing, advising, or employing, either before or after any childbirth, of any drug, other than a disinfectant or cathartic. . . ."

[2]The People's motion to consolidate the writ petitions of Northrup (formerly 3 Civ. 25676) and Young (formerly 3 Civ. 25679) was granted for purposes of hearing only. In the interests of judicial economy and expediency, the court on its own motion has consolidated the two petitions for purposes of decision as well under case number 3 Civil C000306. (See 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 539, pp. 528-529.)

## FACTUAL AND PROCEDURAL BACKGROUND

Petitioners are members of the Church of the First Born. The church traces its origins to the Mayflower pilgrims and currently numbers 150 congregations throughout the United States. Under the tenets of the Church of the First Born, use of medical professionals is not permitted. The members "rely upon the power of God" to assist those who are ill. Pregnant members of the church do not consult obstetricians but call upon women known as "helpers" or "attendants" to assist at childbirth. The helpers are also church members, acknowledged by the church as having received a divine calling, "inspired ... by spirit or by recognition of God through prophecy or revelation." Petitioners are both recognized by the church as helpers.

Three births form the basis of the charges in the present case. On December 29, 1984, petitioners served as helpers during the labor of Pat Bell, petitioner Northrup's daughter. Petitioners prayed, tried to make Bell comfortable, stretched the vaginal opening for delivery of the baby, assisted in the delivery and cut the umbilical cord. Bell's daughter was stillborn.

On January 5, 1985, petitioner Northrup served as helper to Freida Wilkinson. She prayed, felt Wilkinson's abdomen to determine the baby's position, helped enlarge the birth opening and guided the baby at delivery. Wilkinson's daughter was healthy.

On April 26, 1985, petitioner Northrup was the helper during the labor of her daughter-in-law, Deborah Northrup. Petitioner prayed during labor and assisted in the delivery of a baby boy who was stillborn. Petitioner prayed and tried to revive the child, but was unable to do so.

Complaints issued against both petitioners. In the Bell case, a felony violation of section 2053 was alleged. In the Northrup case a misdemeanor violation of section 2052 in the Wilkinson birth and a felony violation of section 2053 in the Northrup case were charged.

At the preliminary hearing, the three mothers testified they were dedicated members of the Church of the First Born and would not seek traditional medical care under any circumstances. They stated they requested petitioners' presence at their deliveries in keeping with their religious practices, beliefs and traditions.

The trial court held petitioners to answer on all counts. Petitioners moved to set aside the informations (Pen. Code, § 995) on the grounds urged in their writ petitions. The court denied the motions. Petitioners now seek a writ of prohibition.

■■■■■■■■■■■

DISCUSSION

I

Section 2505 provides that a "certificate to practice midwifery authorizes the holder to attend cases of normal childbirth." The practice of midwifery is defined as "the furthering or undertaking by any person to assist a woman in normal childbirth." ■ In their replication, petitioners, who are not certificated as midwives, contend their conduct cannot be considered "midwifery." They err.

Petitioners assert they are not engaged in the healing arts but are simply "fulfilling their calling" in serving as helpers to other church members. They do not advertise their services to the public nor do they accept compensation. Much of the assistance they offer is through prayer.

From the evidence adduced at the preliminary hearing, it is clear their services encompassed far more than prayer. Northrup felt one mother's abdomen to determine the fetal position. Both petitioners helped enlarge the vaginal opening for delivery, assisted with the actual delivery of the babies, cut umbilical cords and cared for the mothers throughout labor and delivery.

This conduct constitutes "assist[ing] a woman in childbirth" and the practice of midwifery as defined by the statute.[3] It is likewise the treatment of a "physical condition" within the meaning of sections 2052 and 2053. (See *Bowland* v. *Municipal Court* (1976) 18 Cal.3d 479 [134 Cal.Rptr. 630, 556 P.2d 1081].)

II

■ Petitioners next contend the "religious practice exemption" of section 2063 exempts them from the certification requirements of Business and Professions Code, division 2, chapter 5, the Medical Practice Act (the Act) (§ 2000 et seq.). This contention has merit.[4]

The Act regulates the licensing and certification of medical professionals, including physicians and surgeons (§ 2051 et seq.), osteopaths (§ 2099.5), podiatrists (§ 2460-2499.6), drugless practitioners (§§ 2500-2504) and midwives (§§ 2505-2515). The Act forbids practicing any of these healing arts

---

[3]Contrary to petitioners' suggestions, the scope of the Medical Practice Act is not limited to individuals who advertise or receive compensation.

[4]We emphasize the issue before us is whether petitioners fall within this exemption, not whether such an exemption is statutorily compelled.

without a proper license or certificate. (§§ 2052, 2053.) Among the exceptions to the licensing requirements is that contained in section 2063.

Section 2063 provides in relevant part: "Nothing in this chapter [the Medical Practice Act] shall be construed so as to . . . regulate, prohibit, or apply to any kind of treatment by prayer, nor interfere *in any way* with the practice of religion." (Italics added.)

No case has been cited to us and we have not found any construing "practice of religion" as used in section 2063. However, it is unnecessary that we fill this vacuum by grappling with a definition of religion and what is a bona fide practice of religion for purposes of section 2063. The People do not challenge the validity of petitioners' religion.

There has been no suggestion the Church of the First Born is pretextual or a subterfuge designed to circumvent the licensing statutes. To the contrary, the evidence adduced at the preliminary hearing establishes the church as a religion of long standing, the genesis in this country being with the Pilgrims of the Mayflower. The religion and its practices long predated not only any licensing statutes but the establishing of any states in the United States. Nor is the congregation of which petitioners are members a unit with no affiliation. There are some 150 congregations of the Church of the First Born in the United States.

Petitioners assert the midwife certification requirements interfere with the practice of their religion by forcing birth helpers to seek medical assistance in certain situations.

The statutory scheme regulating the practice of midwifery discloses an intended close association between midwives and doctors. Section 2506 requires the Division of Allied Health Professionals to take disciplinary action against any midwife for unprofessional conduct as defined in subsequent sections. A midwife cannot treat a complicated vertex presentation without calling, or attempting to call, a person authorized to practice medicine (§ 2509). She must refer to a doctor any patient who develops enumerated symptoms or conditions during pregnancy (§ 2510), labor (§ 2511) or lying-in (§ 2512). A midwife must also refer a newborn with specified conditions (§ 2513). Failure to comply with any of these requirements constitutes unprofessional conduct, subjecting a midwife to disciplinary action.

Testimony at the preliminary hearing established the certification requirements as antithetical to the religious practices of the Church of the First Born. For generations, church women have relied on helpers during childbirth. Helpers cannot refer cases to physicians without violating their reli-

gious beliefs nor can members of the church accept such a referral.[5] The obligations of a certified midwife as outlined by statute conflict with these religious practices.

We conclude petitioners are exempt from the certification requirements and cannot be prosecuted under sections 2052 and 2053 insofar as their childbirth helper activities where other church members are concerned.

The plain, unambiguous language of section 2063 compels such a conclusion. The terms of the statute are absolute: licensing requirements cannot *in any way* interfere with the practice of religion. In the present case, they clearly do.

The People offer no alternative explanation of the "religious practice exemption" but urge it does not apply to religious practices which directly conflict with specific licensing provisions of the Act, that to hold otherwise would allow the absurdity of permitting anyone to practice medicine or even surgery without a license or certificate by saying it is a religious practice.

We observe initially that the People have not contended either in the trial court or on this appeal that the religion of petitioners was other than bona fide or the practice of designated helpers assisting in childbirth other than an accepted religious practice of the Church of the First Born. Inherent in the statement that one could practice any healing art by saying it is a religious practice is the implication that the religious practice contention is false and asserted solely to avoid the licensing requirements. That situation does not obtain in the present case.

More significantly, to sustain the People's position would render the express statutory exemption of section 2063 nugatory.

The People next contend a literal reading of the statute is improper given the state's interest in peace and safety. There are two responses to this argument. First, the unambiguous language of section 2063 leaves no room for interpretation. ▮ "[T]he meaning of the statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, . . . the sole function of the courts is to enforce it according to its terms." (*Caminetti* v. *United States* (1917) 242 U.S. 470, 485 [61 L.Ed. 442,

---

[5]The People contend the church's view of the medical profession is a matter of preference, not dogma. The record indicates otherwise. Witnesses clearly testified the church did not permit medical treatment. The People place undue emphasis on a church elder's assertion that, in the spirit of understanding, a member who received medical care would not be banished from the church. We do not interpret this testimony to mean the tenets of the faith permit traditional medical treatment.

452, 37 S.Ct. 192].) "When statutory language is thus clear and unambiguous there is no need for construction, and courts should not indulge in it." (*Solberg* v. *Superior Court* (1977) 19 Cal.3d 182, 198 [137 Cal.Rptr. 460, 561 P.2d 1148].) From the face of the statute, it is clear the Legislature determined that in the licensing context, the state's interests are subservient to its citizens' religious beliefs. Any argument that these competing interests should be reweighed is one best addressed to the Legislature, not the courts. The People's reliance on *Bowland* v. *Municipal Court, supra,* (1976) 18 Cal.3d 479 is misplaced. *Bowland* held only that the state's interest in the "life and well-being of an unborn child" permits the state to regulate the practice of midwifery. (*Id.,* at pp. 495-496.) Petitioners do not challenge the state's authority to license. Instead, they question the scope of the "religious practice exemption," an issue not addressed in *Bowland, supra.*

Second, we emphasize the narrow scope of the "religious practice exemption." The language of section 2063 expressly limits the exemption to chapter 5, the Medical Practice Act. The exemption is applicable only as to the midwife licensing requirements. The state is free to protect its interests in other contexts, as in the field of criminal sanctions. Petitioners as religious practitioners are exempt from the licensing requirements of the Act and a lack of a midwifery license alone would not support a criminal prosecution for death to another.[6] However, second degree murder by an act dangerous to life is not precluded. As the court stated in *People* v. *Watson* (1981) 30 Cal.3d 290 [179 Cal.Rptr. 43, 637 P.2d 279], at page 300: "We have said that second degree murder based on implied malice has been committed when a person does ' " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard to life' " . . . .' (*People* v. *Sedeno, supra,* 10 Cal.3d at p. 719, quoting from *People* v. *Phillips, supra,* 64 Cal.2d 574, 587.)"

And if the act in question does not involve conscious disregard of life but only lack of due caution, a charge of involuntary manslaughter may lie. Manslaughter is defined in our Penal Code as "the unlawful killing of a human being, without malice" (§ 192). One type of involuntary manslaughter defined in Penal Code section 192 is a killing "in the commission of a lawful act which might produce death" if done "without due caution and circumspection." (§ 192, subd. (b).)

---

[6]In *People* v. *Burroughs* (1984) 35 Cal.3d 824, 829-831 [201 Cal.Rptr. 319, 678 P.2d 894], our Supreme Court determined the unlicensed practice of medicine, a violation of section 2053, cannot form the basis of a felony-murder conviction, in the absence of malice, as the underlying felony of unlicensed practice of medicine is not inherently dangerous to human life. However, defendant Burroughs was subject to a charge and conviction of involuntary manslaughter.

Section 2063 does not protect the religious practitioner from prosecution under other statutes, if found applicable.[7] The only protection afforded by the religious exemption is from prosecution for failing to have a midwifery license.

We conclude the trial court erred in denying petitioners' motions to dismiss the informations.

In view of this disposition, we find it unnecessary to consider the remaining contentions of petitioners.

## DISPOSITION

Let a peremptory writ of prohibition issue directing respondent superior court to refrain from taking any further action in superior court case numbers 10655 and 10656, except to dismiss the informations in those cases. Pending finality of this decision, the previously issued stay remains in effect.

Sparks, J., and Sims, J., concurred.

---

[7]The instant case involves only licensing provisions and is readily distinguishable from other cases involving the clash between religious beliefs concerning medical treatment and the state's interest in protecting its citizens. (See, e.g., *Hoener* v. *Bertinato* (1961) 67 N.J.Super 517 [171 A.2d 140], holding parents who were Jehovah's Witnesses could not prevent their child from receiving blood transfusions.)