Filed 4/18/13  (reposted same date to correct footnote numbering)

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>KATHARINE LOUISE MCCALL,<br><br>        Defendant and Appellant. | B236269<br><br>(Los Angeles County<br>Super. Ct. No. BA377545)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br>PETITION<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed on March 20, 2013, be modified as follows:

1.  The paragraph following the "INTRODUCTION" headnote is deleted and replaced with the following:

A jury convicted defendant, Katharine Louise McCall, of practicing medicine without certification, a felony.  (Bus. & Prof. Code,[1] § 2052, subd. (a).)  She was placed

_____

[*]        Pursuant to California Rules of Court, rules 8.1100 and 8.1110, parts I-III(A) and IV of this opinion are certified for publication.

[1]        Except where otherwise noted, all further statutory references are to the Business and Professions Code.

on three years' probation.  Defendant, an unlicensed, unsupervised student midwife, asserts she could not be prosecuted for a felony as charged.  Rather, defendant argues, she could only be convicted of a misdemeanor violation of the Licensed Midwifery Practice Act of 1993 (the Midwifery Act).  (§ 2505 et seq.)  In the published portion of this opinion, we explain why defendant could properly be convicted as charged.  In addition, defendant argues she was convicted of an offense not shown by the evidence at the preliminary hearing and she may have been convicted based on a legally incorrect theory.  In the unpublished portion of this opinion, we explain why any error in granting the prosecutor's motion to amend the information was harmless.  We further conclude defendant's legally invalid theory contention is without merit.

2.  At the end of part III A delete "[Part III(B) is deleted from publication.]" and replace it with "[Parts III B and C are deleted from publication.]"

3.  Add section III C as follows:

   C.  There Is No Possibility Defendant Was Convicted On A Legally Invalid Theory

      Section 2052, subdivision (a) defines the uncertified practice of medicine thusly: "[A]ny person who practices or attempts to practice, or who advertises or holds himself or herself out as practicing, *any system or mode of treating the sick or afflicted in this state, or who diagnoses, treats, operates for, or prescribes for any* ailment, blemish, deformity, disease, disfigurement, disorder, injury, or other physical or mental condition of any person, without having at the time of so doing a valid, unrevoked, or unsuspended certificate as provided in this chapter or without being authorized to perform the act pursuant to a certificate obtained in accordance with some other provision of law is guilty of a public offense . . . ."  (§ 2052, subd. (a), italics added.)  Section 2052, subdivision (a) bans two types of activities.  (*Bowland v. Municipal Court* (1976) 18 Cal.3d 479, 485 [construing former section 2141 (repealed by Stats. 1980, ch. 1313, § 1.6), see now

2

section 2052, subdivision (a) (added by Stats. 1980, ch. 1313, § 2)]; *Hageseth v. Superior Court* (2007) 150 Cal.App.4th 1399, 1418.)  As our Supreme Court explained in *Bowland,* "It is unlawful, first, for an unlicensed person to practice or hold himself out as practicing any 'system or mode of treating the sick or afflicted'; second, the prohibition extends to any actual diagnosis, treatment, surgery or prescription for a 'mental or physical condition,' whether or not such activities comprise a system or mode of treating the sick or afflicted." (*Bowland v. Municipal Court, supra,* 18 Cal.3d at p. 485; accord, *Hageseth v. Superior Court, supra,* 150 Cal.App.4th at p. 1418.)  Pregnancy is a physical condition within the meaning of section 2052, subdivision (a).  (*Bowland v. Municipal Court, supra,* 18 Cal.3d at pp. 486, 488-489; *Northrup v. Superior Court* (1987) 192 Cal.App.3d 276, 280.)  "Diagnose" for purposes of section 2052, subdivision (a), is defined in section 2038:  "Whenever the words 'diagnose' or 'diagnosis' are used in this [Medical Practice Act], they include any undertaking by any method, device, or procedure whatsoever, and whether gratuitous or not, to ascertain or establish whether a person is suffering from any physical or mental disorder.  Such terms shall also include the taking of a person's blood pressure and the use of mechanical devices or machines for the purpose of making a diagnosis and representing to such person any conclusion regarding his or her physical or mental condition.  Machines or mechanical devices for measuring or ascertaining height or weight are excluded from this section."  Statutory exceptions also exist for pharmacists.  A pharmacist does not run afoul of section 2052, subdivision (a), by taking a person's blood pressure and offering an opinion or advice, (§ 4103), or performing other procedures in a licensed health care facility (§ 4052.1).

3

The prosecution asserted defendant violated section 2052, subdivision (a) in two respects. First, the prosecution argued defendant violated section 2052, subdivision (a) during prenatal and postpartum visits. Second, the prosecution argued the statute was violated during Ms. Tienzo's labor and delivery. Defendant did not dispute she engaged in the unlicensed practice of medicine during the labor and delivery. She argued, however, that she was immune from criminal prosecution under section 2058, subdivision (a) [8], because she acted in the face of a medical emergency. With respect to prenatal care, the prosecution argued defendant practiced medicine when she took Ms. Tienzo's blood pressure, examined the fetus's position within the womb, conducted urine tests, and listened to the baby's heartbeat with a Doppler. With respect to postpartum care, the prosecution argued defendant practiced medicine without a license when Ms. Tienzo's sutures were examined. Also, the prosecution cites to defendant's offer to remove a flap of excess skin. The jury was instructed, "[I]n order to return a verdict of guilty [of practicing medicine without a license], all jurors must agree that [defendant] committed the same act or acts. It is not necessary that the particular act agreed upon be stated in your verdict."

Defendant asserts reversible error occurred in that the jury was presented with a legally invalid theory with respect to the prenatal and postpartum care. (See *People v. Perez* (2005) 35 Cal.4th 1219, 1233; *People v. Morales* (2013) 212 Cal.App.4th 583, 595.) She asserts her actions during prenatal and postpartum visits did not come within the statutory definition of the crime. As our Supreme Court has explained: "When one of the theories presented to a jury is legally inadequate, such as a theory which '"fails to come within the statutory definition of the crime"' (*People v. Guiton* [(1993)] 4 Cal.4th [1116,] 1128, quoting *Griffin v. United States* (1991) 502 U.S. 46, 59), the jury cannot reasonably be expected to divine its legal inadequacy. The jury may render a verdict on

_____

[8]    Section 2058, subdivision (a) provides:  "Nothing in this [Medical Practice Act] chapter prohibits service in the case of an emergency . . . ."

the basis of the legally invalid theory without realizing that, as a matter of law, its factual findings are insufficient to constitute the charged crime,  In such circumstances, reversal generally is required unless 'it is possible to determine from other portions of the verdict that the jury necessarily found the defendant guilty on a proper theory.'  ([*People v.*] *Guiton,* [*supra,* 4 Cal.4th] at p. 1130.)" (*People v. Perez, supra,* 35 Cal.4th at p. 1233; accord, *People v. Morales, supra,* 212 Cal.App.4th at p. 595.)  Defendant further asserts nothing in the record demonstrates the jury convicted her only for practicing medicine without a license during the labor and delivery.  (See *People v. Perez, supra,* 35 Cal.4th at p. 1233.)  As the *Perez* court explained, "'[W]hen the prosecution presents its case to the jury on alternate theories, some of which are legally correct and others legally incorrect, and the reviewing court cannot determine from the record on which theory the ensuing general verdict of guilt rested, the conviction cannot stand.' (*People v. Green* (1980) 27 Cal.3d 1, 69 [overruled on other points by *People v. Hall* (1986) 41 Cal.3d 826, 834, fn. 3, and *People v. Martinez* (1999) 20 Cal.4th 225, 239].)" (*People v. Perez, supra,* 35 Cal.4th  at p. 1233.)

With respect to the legal invalidity of the prosecution's prenatal and postpartum care theory, defendant argues Ms. Tienzo was not "sick or afflicted" at those times.  As noted above, however, section 2052, subdivision (a), also proscribes diagnosing or treating any physical condition.  Pregnancy is a physical condition within the meaning of section 2052, subdivision (a). (*Bowland v. Municipal Court, supra,* 18 Cal.3d at pp. 486, 488-489; *Northrup v. Superior Court, supra,* 192 Cal.App.3d at p. 280.)  Hence, defendant could be prosecuted for diagnosing or treating a physical condition.

Defendant further asserts:  she did not engage in "diagnosis" during prenatal visits; she never attempted to recognize a disease from symptoms; she never provided treatment for any disease; and she never used any machine to ascertain whether a person was suffering from any physical disorder.  That contention is without merit.  As noted above, to "diagnose" within the meaning of the Medical Practice Act, is to undertake any method to ascertain whether a person is suffering from any physical disorder.  As noted, the Medical Practice Act includes the Midwifery Act.  Further, section 2038 states, "Such

5

terms shall also include the taking of a person's blood pressure and the use of mechanical devices or machines for the purpose of making a diagnosis and representing to such person any conclusion regarding his or her physical or mental condition."

It is undisputed that during prenatal visits, defendant: took Ms. Tienzo's blood pressure; checked the fetus's position within the womb; listened to the baby's heartbeat with a Doppler; and conducted urine tests. The purpose of these procedures was to determine whether Ms. Tienzo's pregnancy was proceeding as expected. That is, the procedures were designed to determine whether Ms. Tienzo was suffering from any physical disorder indicating a problem with her pregnancy. The potential disorders include high blood pressure, a turned fetus, an irregular fetal heartbeat, or abnormal urine readings. At one point, defendant told Ms. Tienzo the fetus was in a breach position. During a post-delivery examination, defendant offered to remove an excess flap of skin at the site of Ms. Tienzo's sutures. During their conversations, defendant discussed and made representations concerning Ms. Tienzo's physical condition and pregnancy.

Defendant argues the jury should never have been instructed that "diagnosis" includes taking a person's blood pressure or using a mechanical device or machine to make and communicate a diagnosis. Defendant reasons the instruction "gave the jury a legally invalid theory of guilt" in that: "[Defendant] did not engage in diagnosis when she took [Ms.] Tienzo's blood pressure or used a Doppler. . . . [S]he never endeavored to establish whether [Ms.] Tienzo was suffering from a physical disorder. She never purported to recognize a disease from its symptoms. She was not engaged in 'treating the sick or afflicted.' (§ 2052.)" However, in the trial court, defense counsel's only objection was that the instruction defining diagnosis in the language of section 2038 was "constitutionally overbroad." The present legal invalidity objection was not raised. And defendant never requested an instruction excluding the language referencing taking a person's blood pressure or using a mechanical device. As a result, defendant forfeited this contention. (*People v. Valdez* (2012) 55 Cal.4th 82, 149; *People v. Geier* (2007) 41 Cal.4th 555, 590.) Even if not forfeited, the claim fails on the merits for the reasons discussed in the preceding paragraph.

Finally, defendant argues section 2038, defining "diagnose" or "diagnosis," was never intended to apply to well care provided during prenatal visits. She cites legislative history indicating the Board of Medical Examiners sponsored the legislation. The legislation was intended to prevent street corner charlatans from taking advantage of people by purporting to diagnose conditions. We disagree with defendant's position. Under its plain language, section 2038's definition of "diagnose" or "diagnosis" clearly applies to an uncertified individual practicing midwifery. (See *People v. Licas* (2007) 41 Cal.4th 362, 367; *People v. Lopez* (2003) 31 Cal.4th 1051, 1056.)

There is no change in the judgment.

Defendant's rehearing petition is denied.


_____  _____  _____
TURNER, P. J.          ARMSTRONG, J.          KRIEGLER, J.

Filed 3/20/13  (unmodified version)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>KATHARINE LOUISE MCCALL,<br><br>    Defendant and Appellant. | B236269<br><br>(Los Angeles County<br>Super. Ct. No. BA377545) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Stephen A. Marcus, Judge.  Affirmed.

Carla Castillo, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Noah P. Hill, Deputy Attorneys General, for Plaintiff and Respondent.

---

\*    Pursuant to California Rules of Court, rules 8.1100 and 8.1110, parts I-III(A) and IV of this opinion are certified for publication.

## I.  INTRODUCTION

A jury convicted defendant, Katharine Louise McCall, of practicing medicine without certification, a felony.  (Bus. & Prof. Code,[1] § 2052, subd. (a).)  She was placed on three years' probation.  Defendant, an unlicensed, unsupervised student midwife, asserts she could not be prosecuted for a felony as charged.  Rather, defendant argues she could only be convicted of a misdemeanor violation of the Licensed Midwifery Practice Act of 1993 (§ 2505 et seq.) (the Midwifery Act).  In the published portion of this opinion, we explain why defendant could properly be convicted as charged.  In addition, defendant argues she was convicted of an offense not shown by the evidence at the preliminary hearing.  In the unpublished portion of this opinion, we explain why any error in granting the prosecutor's motion to amend the information was harmless.

## II.  THE EVIDENCE

The central facts are undisputed.  Defendant was a student midwife.  She was not licensed to act as a midwife.  Under the Midwifery Act, she was authorized to engage in midwifery only as part of her course of study.  Further, she could lawfully engage in midwifery only under the supervision of a licensed midwife, "who is present on the premises at all times client services are provided," or a physician and surgeon.  (§ 2514.)  In November 2007, Joy Tienzo, who was six to seven months pregnant, contracted with defendant for midwife services.  In their conversations, defendant said she was not licensed.  Ms. Tienzo was told a licensed midwife would attend the birth.  Defendant provided prenatal care to Ms. Tienzo on a regular basis over several weeks.  Defendant checked Ms. Tienzo's blood pressure and conducted urine tests.  Defendant palpated Ms. Tienzo's abdomen and monitored the fetus's heart rate.  Defendant attended

---

[1]  Except where otherwise noted, all further statutory references are to the Business and Professions Code.

Ms. Tienzo's labor and delivery. During the labor and delivery, defendant: checked Ms. Tienzo's vital signs; examined Ms. Tienzo's cervical dilation; monitored the baby's heart rate; told Ms. Tienzo the baby had "shoulder dystocia"— that is, the baby's head was stuck against Ms. Tienzo's pelvic bone; guided the baby out; clamped and cut the umbilical cord; manually removed the placenta from the uterine wall; gave Ms. Tienzo an injection of Pitocin to stop hemorrhaging; and administered Lidocaine and sutured a tear in Ms. Tienzo's perineum. At no time during the labor and delivery did defendant make any effort to call an emergency operator. During a post-delivery checkup, defendant examined the sutures and offered to remove excess skin at the site. Ms. Tienzo declined the offer. At no time was defendant supervised by a licensed midwife, a physician or a surgeon.

There was conflicting testimony as to whether defendant had engaged in the uncertified practice of medicine. There was also evidence defendant had been confronted with an emergency situation during the delivery. In addition to considering the testimony, we have examined all of the exhibits.

Dr. Erich Pollak was called as a witness for the prosecution. Dr. Pollak had been practicing medicine for 50 years. He was a medical consultant with the Medical Board of California. He had participated in the investigation of defendant's conduct. Dr. Pollak opined that a layperson who engages in examination, diagnosis, treatment or operation has unlawfully practiced medicine. According to Dr. Pollak, an unlicensed and unsupervised student midwife engages in the uncertified practice of medicine when he or she: check's a patient's blood pressure; conducts urinalysis; palpates a pregnant patient's abdomen; checks a baby's heart rate with a Doppler; examines a woman's cervix for dilation during labor; guides a baby out of the birth canal; clamps and cuts an umbilical cord; removes the placenta; administers Pitocin or Lidocaine; stitches a perineal tear; performs a newborn checkup; examines sutures; and offers to remove a flap of skin.

Dr. Martin Chenevert testified for the defense. Dr. Chenevert disagreed with Dr. Pollak's opinion that defendant practiced medicine without certification during the prenatal visits with Ms. Tienzo. In Dr. Chenevert's opinion, an unlicensed student

3

midwife may perform the following acts without illegally practicing medicine so long as the student has not diagnosed or treated the patient: take a patient's blood pressure; listen to a baby's heartbeat with a Doppler; palpate a pregnant woman's stomach; and have a woman urinate on a protein strip. In addition, so long as a layperson does not make a "firm diagnosis," palpating a pregnant woman's stomach and suspecting a breech position does not constitute practicing medicine. Dr. Chenevert further explained that shoulder dystocia constitutes a medical emergency. Under those circumstances, seeking emergency assistance would not be a sufficient response. The emergency would have to be dealt with at the location where it occurred. Postpartum hemorrhaging is a potentially life-threatening situation. It would be appropriate for a student midwife to respond on site and administer Pitocin to reduce bleeding. It would also be appropriate to stitch a perineal tear to stop further blood loss where a patient had already lost a lot of blood from another source.

Dr. Stuart Fischbein also testified for the defense. Dr. Fischbein had 25 years' experience as an obstetrician and gynecologist. Dr. Fischbein agreed with Dr. Pollak that the following conduct constituted practicing medicine: suturing; placenta removal; and administering Pitocin. Dr. Fischbein disagreed, however, that defendant had practiced medicine during the prenatal visits. Dr. Fischbein testified: "[P]renatal care in the midwifery model is essentially 95 percent advice and 5 percent screening, and I don't consider either of those to be the practice of medicine." Dr. Fischbein testified that if shoulder dystocia occurred, the condition would have had to be resolved within a minute or two. Dr. Fischbein also testified, however, that defendant did unlawfully practice medicine when she delivered Ms. Tienzo's baby.

4

## III. DISCUSSION

## A. Defendant Was Subject To Felony Prosecution

### 1. The *Williamson* Rule

Defendant asserts she could not lawfully be subject to felony prosecution under the general statute prohibiting the uncertified practice of medicine.  (§ 2052, subd. (a).)  Rather, defendant argues she was subject only to misdemeanor prosecution for violating the Midwifery Act  (§ 2514).  She argues section 2514, a specific criminal statute governing midwifery, supplants section 2052, subdivision (a), a general prohibition governing medical practice.  (See *People v. Murphy* (2011) 52 Cal.4th 81, 86-88; *Mitchell v. Superior Court* (1989) 49 Cal.3d 1230, 1250, fn. 14; *In re Williamson* (1954) 43 Cal.2d 651, 655.)  The issue, defendant claims, is whether she is being subjected to a greater punishment than specified by the Legislature.  (See *Mitchell v. Superior Court, supra,* 49 Cal.3d at p. 1250, fn. 14; *People v. Woods* (1986) 177 Cal.App.3d 327, 333-334.)  Defendant's argument is without merit.

Our review is governed by the rules of statutory construction.  (See *People v. Murphy, supra,* 52 Cal.4th at pp. 86-88; *In re Williamson, supra,* 43 Cal.2d at p. 655.)  As our Supreme Court has explained:  "[W]e must look first to the words of the statute because they are the most reliable indicator of legislative intent.  (*People v. Lawrence* (2000) 24 Cal.4th 219, 230.)  If the statutory language is clear and unambiguous, the plain meaning of the statute governs.  (*Id.* at pp. 230-231.)"  (*People v. Lopez* (2003) 31 Cal.4th 1051, 1056; accord, *People v. Licas* (2007) 41 Cal.4th 362, 367.)  Further, "'We do not . . . consider the statutory language "in isolation."  [Citation.]  Rather, we [must] look to "the entire substance of the statute . . . in order to determine the scope and purpose of the provision . . . .  [Citation.]"  [Citation.]  That is, we [should] construe the words in question "'in context, keeping in mind the nature and obvious purpose of the

5

statute . . . . [Citation.]' . . . (*People v. Murphy* (2001) 25 Cal.4th 136, 142.)" (*In re Reeves* (2005) 35 Cal.4th 765, 783.)

The rule of law on which defendant relies was set forth in *In re Williamson, supra,* 43 Cal.2d at page 654. "'It is the general rule that where the general statute standing alone would include the same matter as the special act, and thus conflict with it, the special act will be considered as an exception to the general statute whether it was passed before or after such general enactment. Where the special statute is later it will be regarded as an exception to or qualification of the prior general one; and where the general act is later the special statute will be considered as remaining an exception to its terms unless it is repealed in general words or by necessary implication.' (*People v. Breyer* [(1934)] 139 Cal.App. 547, 550; *Riley v. Forbes* [(1924)] 193 Cal. 740, 845.)" (*In re Williamson, supra,* 43 Cal.2d at p. 654; accord, *People v. Murphy, supra,* 52 Cal.4th at p. 86.) Our Supreme examined the *Williamson* rule in *People v. Murphy, supra,* 52 Cal.4th at pages 86-88: "Under the *Williamson* rule, if a general statute includes the same conduct as a special statute, the court infers that the Legislature intended that conduct to be prosecuted exclusively under the special statute. In effect, the special statute is interpreted as creating an exception to the general statute for conduct that otherwise could be prosecuted under either statute. [(*In re Williamson, supra,* 43 Cal.2d at p. 654.)] 'The rule is not one of constitutional or statutory mandate, but serves as an aid to judicial interpretation when two statutes conflict.' (*People v. Walker* (2002) 29 Cal.4th 577, 586.) 'The doctrine that a specific statute precludes any prosecution under a general statute is a rule designed to ascertain and carry out legislative intent. The fact that the Legislature has enacted a specific statute covering much the same ground as a more general law is a powerful indication that the Legislature intended the specific provision alone to apply. Indeed, in most instances, an overlap of provisions is determinative of the issue of legislative intent and "requires us to give effect to the special provision alone in the face of the dual applicability of the general provision . . .' and the special provision. . . ." (*People v. Gilbert* [(1969)] 1 Cal.3d [475,] 481.)' (*People v. Jenkins* (1980) 28 Cal.3d 494, 505-506 . . . , fn. omitted.) [¶] Absent some

6

indication of legislative intent to the contrary, the *Williamson* rule applies when (1) 'each element of the general statute corresponds to an element on the face of the special statute' or (2) when 'it appears from the statutory context that a violation of the special statute will necessarily or commonly result in a violation of the general statute.' (*People v. Watson* (1981) 30 Cal.3d 290, 295-296 . . . .) In its clearest application, the rule is triggered when a violation of a provision of the special statute would inevitably constitute a violation of the general statute."

In *Williamson,* for example, the defendant was charged with conspiring to act as a contractor without a license in violation of the general conspiracy statute, Penal Code section 182, subdivision 1. The charged conspiracy was punishable as a misdemeanor or as a felony. (Pen. Code, § 182.) However, the Business and Professions Code specifically provided that conspiring to act as a contractor without a license was a misdemeanor. Section 7028 stated, "'It is unlawful for any person to engage in the business or act in the capacity of a contractor within this state without having a license therefor unless such person is particularly exempted from the provisions of this chapter.'" (*In re Williamson, supra,* 43 Cal.2d at p. 652, fn. 1.) Section 7030 stated, "'Any person who acts in the capacity of a contractor without a license, and any person who conspires with another person to violate any of the provisions of this [licensing] chapter is guilty of a misdemeanor.'" (*Id.* at p. 653, fn. 2.) Our Supreme Court held the specific statute clearly controlled over the general one. (*Id.* at p. 654.) Our Supreme Court reasoned, "To conclude that the punishment for the violation of section 7030 of the Business and Professions Code is stated in section 182 of the Penal Code, which deals with conspiracies in general, would be inconsistent with the designation of the particular conspiracy as a misdemeanor." (*Id.* at p. 655.)

7

## 2. Statutory Context

### a. Overview

Both the general provision under which defendant was convicted and the specific statute governing midwifery are found in Division 2 of the Business and Professions Code, "Healing Arts," Chapter 5, the Medical Practice Act (§ 2000 et seq.)  The Medical Practice Act contains more than 30 articles including Article 3, "License Required and Exemptions" (§ 2050 et seq.) and Article 24, "Licensed Midwives" (§ 2505 et seq.).

### b. Article 3: The Physician's and Surgeon's Certificate

The Division of Licensing of the Medical Board of California is authorized to issue a physician's and surgeon's certificate.  (§ 2050.)  A physician's and surgeon's certificate authorizes the holder as follows, "[T]o use drugs or devices in or upon human beings and to sever or penetrate the tissues of human beings and to use any and all other methods in the treatment of diseases, injuries, deformities, and other physical and mental conditions."  (§ 2051.)  A person who engages in such acts without a physician's and surgeon's certificate is guilty of a felony or a misdemeanor, " . . . [A]ny person who practices or attempts to practice . . . any system or mode of treating the sick or afflicted in this state, or who diagnoses, treats, operates for, or prescribes for any ailment, blemish, deformity, disease, disfigurement, disorder, injury, or other physical or mental condition of any person, without having at the time of so doing a valid, unrevoked, or unsuspended certificate as provided in this chapter or without being authorized to perform the act pursuant to a certificate obtained in accordance with some other provision of law is guilty of a public offense, punishable by a fine not exceeding ten thousand dollars ($10,000), by imprisonment in the state prison, by imprisonment in a county jail not exceeding one

year, or by both the fine and either imprisonment." (§ 2052, subd. (a).)[2] Section 2052, subdivision (c) provides, "The remedy provided in this section shall not preclude any other remedy provided by law." Section 2061 provides, "Nothing in this chapter shall be construed as limiting the practice of other persons licensed, certified, or registered under any other provision of law relating to the healing arts when such person is engaged in his or her authorized and licensed practice."

### c. Article 24: The Licensed Midwifery Practice Act

Article 24 of the Medical Practice Act contains the Midwifery Act. The legislative purpose in adopting the Midwifery Act was to increase the availability of prenatal, delivery and post-delivery care to low-income women. Increased access to prenatal and delivery care was expected to decrease the high rate of mortality due to low birth weight in newborns. (Stats. 1993, ch. 1280, § 1, pp. 7535-7536.)[3] The Midwifery Act

---

[2] After defendant committed the present offense, effective October 1, 2011, section 2052, subdivision (a), was amended to state the offense is punishable "by a fine not exceeding ten thousand dollars ($10,000), *by imprisonment pursuant to subdivision (h) of Section 1170 of the Penal Code*, by imprisonment in a county jail not exceeding one year, or by both the fine and either imprisonment." (Stats. 2011, ch. 15, § 11, italics added.)

[3] The codified statement of legislative intent reads: "The Legislature finds and declares all of the following: [¶] (a) Over 40,000 babies die every year in the United States, many of them as a result of being born severely underweight. That rate, among the worst in the developed world, has been condemned by health experts as a preventable tragedy and a national disgrace. [¶] (b) Research has shown for every dollar society might spend to reduce the number of underweight births, three dollars ($3) in medical-care costs could be saved. [¶] (c) The increasing state budget deficit limits the amounts of state funds available to subsidize public health care. [¶] (d) It is in agreement with the principle stated by the World Health Organization that each woman has a fundamental right to receive proper prenatal care, that the woman has a central role in all aspects of this care, including participation in the planning, carrying out, and evaluation of the care, and that social, emotional, and psychological factors are decisive in the understanding and implementation of proper prenatal care. [¶] (e) Prenatal care reduces the incidence of low birth weights. [¶] (f) The number of available physicians and surgeons to serve

9

authorizes the Division of Licensing of the Medical Board of California to issue a license to practice midwifery. (§ 2505 et seq.) A person is qualified for a midwifery license only after meeting specified educational and clinical practice requirements. (§ 2512.5.) A midwifery license authorizes the holder, in "cases of normal childbirth," "to provide prenatal, intrapartum, and postpartum care" for the mother. In addition, a midwife license holder is permitted to provide "immediate care for the newborn." (§ 2507, subd. (a).)[4] However, a licensed midwife must be supervised by a licensed physician and surgeon. The physician and surgeon need not be physically present. (§ 2507, subds. (a)-(c).) A licensed midwife must make specific disclosures to prospective clients. (§ 2508.) A licensed midwife also must meet annual reporting requirements. (§ 2516.) A person not licensed to practice midwifery may not hold him or herself out as so licensed or imply that he or she is a licensed midwife. (§ 2511, subd. (a).) A licensed midwife is *not* authorized to practice medicine. Section 2507, subdivision (e) states, "A midwife is not authorized to practice medicine and surgery by this article." And a midwifery license can

---

low-income pregnant women has sharply decreased. [¶] (g) Five nations with the lowest prenatal mortality rates have 70 percent of all births attended by midwives. [¶] (h) In a 1982 report by the Department of Consumer Affairs, recommendations were made to actively promote nurse and nonnurse midwifery services as one means of providing cost-effective, comprehensive perinatal services which have been shown to be effective in lowering perinatal morbidity and mortality rates. [¶] (i) The Office of Statewide Health Planning and Development (OSHPD) recommended in its 1986 study of Alternative Birthing Methods that a separate category of licensed midwives should be established in the Department of Consumer Affairs. [¶] (j) The OSHPD further recommended that competencies for this new category should be comparable to those of nurse-midwives and physician assistant-midwives, although licensure as a registered nurse or physician assistant should not be required to become a licensed midwife. [¶] (k) The Legislature supports a multifaceted, cost-effective approach which includes licensed midwives providing prenatal, delivery and necessary follow-up care to families." (Stats. 1993, ch. 1280, § 1, pp. 7535-7536.)

[4] Normal childbirth is defined and the scope of a midwife's care is delineated in the Medical Board of California Division of Licensing's Standard of Care for California Licensed Midwives, September 15, 2005. (http://www.mbc.ca.gov/allied/ midwives_standards.pdf (as of Mar. 15, 2013).)

10

be suspended or revoked for unprofessional conduct including a conviction for practicing medicine without certification in violation of section 2052.  (§ 2519, subd. (a)(2).)

With respect to midwifery students, section 2514 permits a student midwife to practice midwifery as part of his or her course of study.  But the student midwife may only act under the direct—at all times present—supervision of a licensed midwife, a physician or a surgeon.  Section 2514 states:  "Nothing in this chapter shall be construed to prevent a bona fide student who is enrolled or participating in a midwifery education program or who is enrolled in a program of supervised clinical training from engaging in the practice of midwifery in this state, as part of his or her course of study, if both of the following conditions are met:  [¶]  (a)  The student is under the supervision of a licensed midwife, who holds a clear and unrestricted license in this state, who is present on the premises at all times client services are provided, and who is practicing pursuant to Section 2507, or a physician and surgeon.  [¶]  (b)  The client is informed of the student's status."  Section 2521 makes any violation of the Midwifery Act a misdemeanor, "Any person who violates this article is guilty of a misdemeanor."

## d.  Defendant Was Subject To Felony Prosecution
## For Practicing Medicine Without Certification

It is clear from the foregoing that the general and specific statutes do not overlap.  Section 2052, subdivision (a), generally prohibits of practicing medicine without a physician's and surgeon's certificate.  The Midwifery Act provides for the licensing and regulation of midwives.  It authorizes licensed midwives to assist in normal childbirth under a physician's supervision.  Nothing in the Midwifery Act shields a midwife, licensed or unlicensed, from prosecution for practicing medicine without certification.  (§§ 2507, subd. (e), 2519, subd. (a)(2); see *Bowland v. Municipal Court* (1976) 18 Cal.3d 479, 484-496 [criminal complaint properly charged uncertified midwife with unlicensed practice of medicine]; *Northrup v. Superior Court* (1987) 192 Cal.App.3d 276, 280

11

[unlicensed midwifery is treatment of physical condition within meaning of section 2052].)

Further, none of the elements of the general statute correspond to those of the special statute. The following are the acts prohibited by section 2052, subdivision (a) "[A]ny person who . . . practices or attempts to practice . . . any system or mode of treating the sick or afflicted in this state, or who diagnoses, treats, operates for, or prescribes for any ailment, blemish, deformity, disease, disfigurement, disorder, injury, or other physical or mental condition of any person . . . ." The specific statute authorizes the Medical Board of California to license a midwife once he or she meets specified education and clinical practice requirements. It also requires that a licensed midwife: be supervised by a licensed physician and surgeon; act as a midwife only in cases of normal childbirth; make specific disclosures to prospective clients; and report specified information annually. The specific statute prohibits a person from holding him or herself out as a midwife unless licensed. A person violates Midwifery Act by holding him or herself out as a midwife when not licensed as such, or by failing to make required disclosures or to report required information. In none of those situations does the violation result in the illegal practice of medicine. Further, the Midwifery Act does not authorize a licensed midwife to practice medicine or surgery. As noted, section 2507, subdivision (e) expressly states a midwife may not practice medicine or surgery as a result of the enactment of the Midwifery Act. Also, section 2519, subdivision (a)(2) provides the Medical Board of California may revoke a license issued to a midwife who violates the general statute. Defendant may have committed a misdemeanor violation of the Midwifery Act by performing midwife services without the required supervision of a licensed midwife or a physician and surgeon. But she did a great deal more than that. Her conduct above and beyond the failure to secure supervision constituted, as the jury found, practicing medicine without certification, a felony violation of the general statute.

[Part III(B) is deleted from publication.]

12

B.  Any Error In Amending The Information Was Harmless.

1.  Overview

Defendant argues:  the information was improperly amended to charge an offense not shown by the preliminary hearing evidence; further, this was reversible error.  We have examined all of the exhibits.  We conclude any error was harmless.

2.  The applicable law

The California Constitution protects a defendant from being tried for a criminal offense absent a prior neutral determination—by a grand jury or a magistrate—that the evidence warrants such prosecution.  (Cal. Const., art. I, § 14; *Jones v. Superior Court* (1971) 4 Cal.3d 660, 664; *Parks v. Superior Court* (1952) 38 Cal.2d 609, 611; *People v. Burnett* (1999) 71 Cal.App.4th 151, 165; see also Pen. Code, § 872, subd. (a).)  Article I, section 14 of the California Constitution provides, "Felonies shall be prosecuted as provided by law, either by indictment or, after examination and commitment by a magistrate, by information."  When, as here, the accused is charged by a complaint rather than a grand jury indictment, a preliminary hearing must be held to determine whether there is sufficient cause to believe the defendant is guilty.  (Pen. Code, § 872; *McGill v. Superior Court* (2011) 195 Cal.App.4th 1454, 1467-1468.)  If a defendant is held to answer after a preliminary hearing and a commitment order is issued (Pen. Code, § 872, subd. (a))[5], the prosecutor must file an information.  (Pen. Code, § 739.)  An information

---

[5]     Penal Code section 872, subdivision (a) states:  "If . . . it appears from the examination that a public offense has been committed, and there is sufficient cause to believe that the defendant is guilty, the magistrate shall make or indorse on the complaint an order, signed by him or her, to the following effect:  'It appearing to me that the offense in the within complaint mentioned . . . has been committed, and that there is sufficient cause to believe that the within named A.B. is guilty, I order that he or she be held to answer to the same.'"

filed following a preliminary examination may charge the defendant with any offense named in the commitment order or shown by the evidence presented at the hearing. (Cal. Const., art. I, § 14; Pen. Code, § 739.) Pursuant to Penal Code section 739, "[The information] may charge the defendant with either the offense or offenses named in the order of commitment or any offense or offenses shown by the evidence taken before the magistrate to have been committed. . . ."[6] It is well established that an information so drawn confers jurisdiction on the court to try the defendant. (*Parks v. Superior Court, supra,* 38 Cal.2d at pp. 611-612; *People v. Parker* (1891) 91 Cal. 91, 92-94; *People v. Burnett, supra,* 71 Cal.App.4th at p. 165; *People v. Pitts* (1990) 223 Cal.App.3d 606, 903; *People v. Winters* (1990) 221 Cal.App.3d 997, 1007; *People v. Firestine* (1968) 268 Cal.App.2d 533, 536, fn. 3; *People v. Bomar* (1925) 73 Cal.App. 372, 378.)

Once an information has been filed, it may be amended at any stage of the proceedings. (Pen. Code, § 1009; *People v. Burnett, supra,* 71 Cal.App.4th at p. 165.) However, it may not be amended to charge the defendant with an offense not shown by the preliminary hearing evidence. (Pen. Code, § 1009; *People v. Burnett, supra,* 71 Cal.App.4th at pp. 165-166.) Penal Code section 1009 provides in part, "An indictment or accusation cannot be amended so as to change the offense charged, nor an information so as to charge an offense not shown by the evidence taken at the preliminary examination." As our Supreme Court explained in *Jones v. Superior Court, supra,* 4 Cal.3d at pages 664-665: "[T]he rule has developed that an information which charges the commission of an offense not named in the commitment order will not be upheld

---

**6**　　Penal Code section 739 provides in full: "When a defendant has been examined and committed, as provided in Section 872, it shall be the duty of the district attorney of the county in which the offense is triable to file in the superior court of that county within 15 days after the commitment, an information against the defendant *which may charge the defendant with either the offense or offenses named in the order of commitment or any offense or offenses shown by the evidence taken before the magistrate to have been committed. The information shall be in the name of the people of the State of California and subscribed by the district attorney." (Italics added.)

14

unless: (1) the evidence before the magistrate shows that such offense was committed (Pen. Code, § 739), and (2) that the offense 'arose out of the transaction which was the basis for the commitment" on a related offense. (*Parks v. Superior Court, supra,* 38 Cal.2d 436, 443; see *People v. Chimel* [(1968)] 68 Cal.2d 436, 443, revd. on other grounds, [*Chimel v. California* (1969)] 395 U.S. 752; *People v. Downer* [(1962)] 52 Cal.2d 800, 809-810; *People v. Evans* [(1952)] 39 Cal.2d 242, 249.)"

Decisional authority illustrates the point. In *People v. Burnett, supra,* 71 Cal.App.4th at page 156, the defendant was charged by information with firearms violations occurring on or about a certain date. This was consistent with the evidence at the preliminary hearing. There was evidence at trial, however, that on the charged date defendant committed an additional firearms violation at a separate time with a different weapon. (*Id.* at pp. 157-165.) The jury was informed it could convict the defendant on either one of the two separate incidents. (*Id.* at pp. 167-170.) The defendant argued his conviction must be reversed because he was tried for an offense not shown by the preliminary hearing evidence. (*Id.* at pp. 164-165.) The Court of Appeal for the First Appellate District, Division Two, agreed: "[T]he jurors could have agreed on one offense, but if it was the one described by Daniels, [which was not presented at the preliminary hearing,] it could not legally form the basis of the conviction. Although [defendant] was aware of Daniels's testimony and should have been aware this testimony *could* support a conviction . . . , the only offense shown by the evidence at the preliminary hearing was [defendant's] possession of a [different weapon at a different time]. Any possession by [defendant] of the [weapon] described by Daniels was not the subject of a preliminary hearing or magistrate's determination of probable cause. It follows that [defendant] could not properly be convicted of this offense." (*Id.* at p. 173.)

In *People v. Dominguez* (2008) 166 Cal.App.4th 858, 861, the defendant was charged with one count of vehicle theft. The evidence presented at the preliminary hearing was of one such incident. (*Id.* at pp. 861-862.) The trial evidence, however, was of two separate vehicle thefts on two different occasions. (*Id.* at p. 862.) The trial court, over defense objection, allowed the prosecutor to amend the information to cover both

15

incidents. The trial court instructed the jury it could find the defendant guilty based upon either one of the two incidents. (*Id.* at p. 866.) The jury returned a general guilty verdict. (*Id.* at p. 862.) On appeal, the defendant argued the instruction was reversible error per se. The Attorney General conceded the instruction was improper, but argued it was harmless. (*Id.* at p. 866.) The Court of Appeal for the Sixth Appellate District considered whether the error could be deemed harmless. It noted that the jury was permitted to find the defendant guilty based on alternative factual scenarios, only one of which had been in evidence at the preliminary hearing. The Court of Appeal further observed the defendant was not necessarily convicted of the crime not shown at the preliminary hearing. (*Id.* at p. 868.) The Court of Appeal concluded that, at least where other parts of the verdict did not show the jury found the defendant guilty on a proper basis, the judgment must be reversed. (*Id.* at p. 870.)

Whether to allow an amendment rests in the trial court's discretion. (*People v. Arevalo-Iraheta* (2011) 193 Cal.App.4th 1574, 1581; *People v. Bolden* (1996) 44 Cal.App.4th 707, 716.) Our review is for a clear abuse of discretion. (*People v. Bolden, supra,* 44 Cal.App.4th at p. 716; *People v. Winters* (1990) 221 Cal.App.3d 997, 1005.)

2. Procedural background

The single count in the felony complaint alleges defendant practiced medicine without a license between November 23 and 24, 2007. The evidence introduced at the preliminary hearing focused on Ms. Tienzo's labor and delivery on November 23 and 24, 2007. But there was evidence concerning prenatal or post-delivery care as follows. Ms. Tienzo spoke to Majida Ibrahim, a Medical Board investigator. Ms. Tienzo contracted with defendant for prenatal, birthing and postpartum care. Ms. Tienzo paid a $2,000 fee to defendant. Beginning in August 2007 and continuing into early November 2007, defendant provided prenatal care to Ms. Tienzo every two weeks. Ms. Ibrahim, the investigator, testified: "Starting in August of 2007, [defendant] saw Ms. Tienzo every 2 weeks until the – late October or beginning of November of 2007. Then she started

16

seeing her on a weekly basis. Before she saw her on a weekly basis, she did see her at [defendant's] office. When she started seeing her on a weekly basis, it was at Ms. Tienzo's home." According to Ms. Ibrahim, defendant's office was on Wilshire Boulevard. Several days prior to the delivery, Ms. Ibrahim testified that defendant and Ms. Tienzo had a telephone conversation. Ms. Tienzo said she had started to experience contractions. Reading from her report she prepared, Ms. Ibrahim testified: "Prior to the birth, sometime between November 20th and November 22nd, [defendant] went to Ms. Tienzo's home for the final prenatal visit and she thought the baby was in a posterior position, meaning the head was turned, and she gave her some type of technique to do in order to get the baby in position." The prosecutor also sought to introduce evidence concerning defendant's postnatal examination. However, defense counsel's relevance objection was sustained. At the conclusion of the preliminary hearing, the magistrate found: "Based upon the evidence presented . . . , the following offenses [*sic*] have been committed, and there is sufficient cause to believe the following defendant is guilty thereof, to wit: Katharine McCall, count 1[,] Business and Professions Code [section] 2052[, subdivision ] (a). [¶] I order the defendant be held to answer . . . ."

The information was filed on February 16, 2011. Defendant was charged with "[o]n or between November 23, 2007 and November 24, 2007," practicing medicine without certification in violation of section 2052, subdivision (a). The specific dates alleged, November 23 and 24, 2007, corresponded to Ms. Tienzo's labor and delivery and the felony complaint.

At trial, the prosecution presented evidence defendant practiced medicine without certification at all stages of the contracted-for services. At the close of the prosecution's case, defense counsel made a motion for entry of a judgment of acquittal pursuant to Penal Code section 1118.1. Defense counsel acknowledged the prosecution sought to prove defendant had engaged in the uncertified practice of medicine during prenatal, delivery and post-delivery time periods. Defense counsel acknowledged he was presenting a "two-pronged" defense. The first element of the defense was that what occurred on the date of the delivery of the infant was an emergency. The second aspect

17

of the defense was that what happened before or after the actual birthing process did not involve the practice of medicine. Defendant presented evidence consistent with this strategy.

After the testimony was concluded, the parties discussed jury instructions. An issue arose as to the dates of the alleged unlawful practice of medicine. Defense counsel argued: "There [are] no dates on it . . . the way that this case has been charged, and there is no dispute that the information that we're proceeding on here is on or between November 23rd and 24th, 2007. That's the complaint and the information that we're here on." Defense counsel expressly requested that the dates in the jury instruction conform to the "charging document" which in this case was an information. In response, the prosecutor moved to amend the information as follows; "I'd like to make a motion to amend by interlineations to include on or about September 24, 2007 until January 31, 2008." The prosecutor also argued that the CALJIC and CALCRIM instructions did not contain a date as to when the unlawful practice of medicine allegedly occurred.

Defense counsel objected to amending the information. Defense counsel noted that the testimony had been concluded and argued it was unfair to permit the amendment. According to defense counsel: "[T]hey charged it in a certain way, and here is the problem with that, Your Honor, is that the prenatals, nobody contests, are a different animal than November 23rd and 24th, 2007. There [are] two separate theories of defense on both of those. They are not inconsistent. They are that [defendant] did practice medicine on the dates alleged in the charging document. However, there is a defense to that practice. And that the dates before that are not relevant, and that they weren't the practice of medicine." In response, the trial court granted the motion to amend the information: "I would concede that this is not the best filing of the information, because it normally says 'on or about,' and this does not actually say that, but I am going to allow the amendment." Later, defense counsel argued that the amendment was "an unconstitutional variance from the charging document" which violated defendant's Fifth and Sixth Amendment rights. The trial court concluded by noting that defense counsel was on notice as to the extent of the prosecution evidence. The trial court explained that

18

defense counsel had presented a defense to the prenatal and postbirth allegations of practicing medicine without a license.

The prosecutor argued to the jury that defendant engaged in six acts of practicing medicine without certification, any one of which the jury could agree was a violation of the law. The acts were: first, prenatal care including blood pressure readings, urine tests, fetal heart rate monitoring, and palpating Ms. Tienzo's abdomen; second, checking the cervix for dilation; third, delivery of the baby; fourth, removal of the placenta; fifth, administering Lidocaine and suturing the perineal tear; and sixth, the postpartum checkup and offering to remove a flap of skin. The trial court gave a unanimity instruction.[7] The jury returned a general guilty verdict. The jury was not asked to and did not specify which act or acts constituted the violation of law.

### 3. Conclusion

We conclude that any error was harmless. To begin with, the testimony concerning the delivery is essentially uncontroverted. In addition, we have examined the exhibits. There is no doubt defendant practiced medicine without certification on November 23 and 24, 2007. Simply stated, the testimony and physical evidence concerning the events attendant to the delivery render any order amending the information harmless under any prejudiced-based standard of reversible error. (*Chapman v. California* (1967) 386 U.S. 18, 22; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

---

[7] The jury was instructed: "The defendant is accused of having committed the crime of [p]racticing medicine without a license in Count 1. The prosecution has introduced evidence for the purpose of showing that there is more than one act upon which a conviction on Count 1 may be based. Defendant may be found guilty if the proof shows beyond a reasonable doubt that she committed any one or more of the acts. However, in order to return a verdict of guilty to Count 1, all jurors must agree that she committed the same act or acts. It is not necessary that the particular act agreed upon be stated in your verdict."

[The balance of the opinion is to be published.]

## IV.  DISPOSITION

The judgment is affirmed.

CERTIFIED FOR PARTIAL PUBLICATION

TURNER, P.J.

We concur:

ARMSTRONG, J.

KRIEGLER, J.

20