[No. H003366. Sixth Dist. June 29, 1989.]

BOARD OF MEDICAL QUALITY ASSURANCE, Plaintiff and Respondent, v.
ARTHUR ANDREWS et al., Defendants and Appellants.

COUNSEL

Norman Lariviere, Susan F. Shapiro and Lariviere & Dickerson for Defendants and Appellants.

John K. Van de Kamp, Attorney General, and Richard Arnold, Deputy Attorney General, for Plaintiff and Respondent.

OPINION

CAPACCIOLI, J.—Appellants, the Religious School of Natural Hygiene (RSNH) and its president and first minister, Arthur Andrews, appeal a permanent injunction granted to respondent the Board of Medical Quality Assurance (Board) pursuant to Business and Professions Code section 125.5[1] forbidding appellants from engaging in conduct which the court found constituted unlawful practice of medicine, within the meaning of sections 2052 and 2053 of the Medical Practice Act. Appellants contend that their practices are exempt from the regulations of the Medical Practice Act under section 2063 of that act, citing a decision of another Court of Appeal. (*Northrup* v. *Superior Court* (1987) 192 Cal.App.3d 276 [237 Cal.Rptr. 255].) They also argue that the injunction infringes their rights to free exercise of religion (U.S. Const., 1st Amend.) and their rights of privacy under California law; that an injunction was not warranted since the Board did not demonstrate the possibility of future conduct of the type enjoined but showed only past incidents; and finally that the court abused

_____

[1] All further statutory references are to the Business and Professions Code unless otherwise stated.

its discretion in awarding costs to the Board (§ 125.5, subd. (c)) because the proved investigative costs were not entirely related to the petition before the trial court. None of these contentions have merit and the judgment will be affirmed, although in reaching this result we must disagree with the *Northrup* decision in its construction of section 2063.

## THE STATUTE

The exemption statute upon which appellants rely, section 2063, reads as follows: "Nothing in this chapter [the Medical Practice Act] shall be construed so as to discriminate against any particular school of medicine or surgery, school or college of podiatric medicine, or any other treatment, nor shall it regulate, prohibit, or apply to any kind of treatment by prayer, *nor interfere in any way with the practice of religion.*" (Italics are added and indicate the clause of the statute upon which appellants rely.)

## RECORD

Board initiated this proceeding September 12, 1986, by a petition requesting a temporary restraining order and a permanent injunction pursuant to section 125.5 and sections 2052 and 2053. The petition alleged that appellants (hereafter collectively RSNH) were engaging in the unlawful practice of medicine without a license and that their conduct had injured named individuals.

Board's evidence included an advertisement for RSNH from a periodical. This advertisement did not mention religion. It was entitled "The California Health Sanctuary" and claimed to offer supervised fasting, natural diet, rest, and instruction in natural hygiene.

Also offered was a document published by the Religious School of Natural Hygiene entitled "The Major Tenets - Heed My Words." This document stated that the Religious School of Natural Hygiene is a healing church which operates the California Health Sanctuary near Hollister, California, for those "who seek health restoration, knowledge of health maintenance and experience in healthful living." This document described the philosophy of the RSNH. Among other things it stated that prayer, rest and fasting, along with the laying on of hands are activities which permit God's healing power to be implemented. It also recommended consumption of raw foods or foods in their natural state.

A card given to members of the RSNH states that the practices of this organization preclude use of drugs, medicines, vaccinations, blood transfusions, X-rays "and all other such practices." The RSNH encourages prayer and fasting, often for long periods of time, as instruments to promote heal-

ing and eliminate disease. It further recommends organic and uncooked foods.

Board further presented evidence of practices of RSNH which included promulgating a doctrine that many physical conditions can be cured by undergoing supervised periods of fasting; persuading certain individuals to participate in such fasts, under supervision of appellant Andrews, who received compensation; advising some persons to stop taking medications prescribed by a physician; and performing diagnostic procedures such as physical examinations with a stethoscope, taking blood pressures and pulses, feeling parts of the body, examining the mouth and eyes, and in one case attempting to remove a colonic blockage by hand. Specifically, Board presented declarations and testimonial evidence of five individuals who had fasted under Andrews' supervision and who claimed to have been injured, as well as evidence concerning another individual who had died immediately after undergoing a lengthy supervised fast. Each of the surviving witnesses claimed severe and persistent physical injury as a result of a prolonged fast. Also, each of these witnesses claims to have consulted Andrews in order to correct a physical ailment, not for religious or spiritual purposes.

For example, Sproule consulted Andrews for a case of hypoglycemia. She fasted, under Andrews' supervision, for 55 days. During the fast Andrews checked her blood pressure, eyes, mouth and other things. After the 30th day she began to vomit without relief. After the 38th day she lost full consciousness and became too weak to walk. Her urine became the color of iodine. Andrews told her the fast would end when the urine became a lighter color. She relied on Andrews to tell her the proper time to end the fast. At the end of the fast she was hospitalized and could not read, write, walk or talk. She is still unable to walk unaided and for the most part is restricted to a wheel chair. She suffers mental difficulties which she did not have before the starvation treatment.

Nettle came to Andrews to lose weight. Andrews said he was a healer and held himself out as having special skill and knowledge to treat obesity by supervised fasting. She paid him to supervise her fasts, which he did for payment. She fasted as much as 30 days at a stretch, receiving only water. During these fasts she had such symptoms as multiple vomiting without relief, irregular menstruation, bloody urine, and amnesia, and lost the ability to work and developed great mental confusion. When she was delirious Andrews said things to her concerning religion. She was at the Health Sanctuary for 10 months and lost 160 pounds. To the present day she suffers adverse physical and mental symptoms which her doctors attribute to the starvation.

David and Roberta Pressman, husband and wife, fasted together at the Health Sanctuary under Andrews' supervision. David Pressman came to

Andrews to correct a variety of physical symptoms including a prolapsed mitral heart valve, fatty tumors in his limbs, and a toenail fungus. Other than these problems and being nearsighted he had no diseases or impairments. When he came to RSNH Andrews took his medical history, listened to his heart, took his pulse and blood pressure, felt his forehead, and checked him generally. He was then placed on a water-only diet for 46 days. Andrews supervised the fast. He took Pressman's pulse and blood pressure daily and felt his forehead and smelt his breath. He said the breath smelled bad but this was a good sign and showed bodily toxins were being eliminated. During the fast Pressman suffered from dry mouth, extreme weakness, nausea, constipation, insomnia, and freezing at night. At the end of the fast he had severe double vision and was not strong enough to stand. After he regained strength he consulted medical specialists and was told he had loss of neurological function and enervation of the eyes caused by vitamin starvation, specifically thiamine deprivation. He has persistent double vision still. He paid Andrews $5,400 for supervising the fasts of himself and his wife.

His wife Roberta testified she came to Andrews for symptoms such as acne, menstrual dysfunction, hemorrhoids, constipation, and allergies. She took medication for the acne and menstrual pain. Andrews told her to discontinue the medication and undergo a water-only fast to cure her conditions. He also told her that almost all human ailments are caused by toxins within the body and that during a fast with rest, the body does not have to perform its normal functions and has extra energy to rid itself of these toxins. He claimed to have extensive training in human anatomy, health, and medicine, and to have studied fasting on his own and with a Dr. Herbert M. Shelton. Accordingly, she underwent a fast which lasted 46 days. The adverse symptoms she suffered are similar to those of her husband including extreme weakness, nausea, constipation, insomnia, and freezing at night. About the 28th day she began vomiting and toward the end vomited almost continuously. Andrews said this was a good sign and showed the body was purifying itself. She also developed bladder pain and a sensation of tingling over her whole body, which Andrews also said was a good sign. When Andrews finally broke her fast she weighed 95 pounds and could not stand. During the weeks after the fast while she was recuperating at the RSNH, she had great difficulty walking. Andrews spent time trying to get her to walk up and down a staircase and yelled at her when she fell. Once he told her if she did not walk he would give her no dinner, which terrified her since by then "the meals were all that I lived for." One of the staff smuggled her a plate of vegetables. When she left the fasting place she was still very weak and unable to walk on any hard surface, especially cement in the open, for fear of falling. She has persistent weakness on her left side and constant pain in her thighs, loss of neurological function

caused by vitamin starvation (according to her doctors), and fear of walking.

Ted Mauk came to the RSNH after having been given a barium enema at Kaiser Hospital, South San Francisco, and being told he needed surgery. Andrews said he could help him without surgery and that Mauk did not have cancer because he had seen cancer patients and they were all skinny; Mauk was not skinny enough to have cancer. Mauk was placed on a water diet for four weeks. When he resumed eating his former symptoms of colon problems recurred. Andrews then took him to an osteopath who gave him a high colonic irrigation, but the pain persisted. Andrews also tried, unsuccessfully, to remove a blockage manually by hand from Mauk's colon. Finally Andrews took him to Kaiser Hospital where he underwent a colostomy. He has since had three operations because of cancer of the colon.

Evidence was also presented regarding Sara Roundtree, an individual who died after fasting at RSNH. She fasted several times, each fast lasting from 10 to 30 days. A doctor reviewed her history and data sheet prepared by a student at the RSNH which indicated she went to Andrews to lose weight. She also suffered from depression and had been involved with drug and alcohol abuse. During her fast under Andrews' supervision she reported such symptoms as inability to walk, weakness, pain in her joints, swollen extremities, a feeling of electricity through her body, foul smelling urine, and sleepiness. The doctor testified these were adverse medical symptoms caused by starvation and required medical attention. Eventually during a fast she developed severe diarrhea; Andrews took her to the hospital and she died there five hours later. The cause of death on the autopsy report was sepsis, probable, due to "inanition" (starvation). The testifying forensic pathologist explained the probable cause of death as metabolic acidosis due to starvation and leading to infection (sepsis) in the body. Both he and another doctor who testified as an expert witness gave the opinion she died of metabolic acidosis caused by starvation.

Both doctors who testified as expert witnesses, Dr. Sampson and Dr. Margen, gave the opinions that prolonged fasting is dangerous to life. In addition Dr. Sampson testified that Andrews' practices with respect to all the witnesses who fasted constituted the practice of medicine.

RSNH presented evidence that supervised fasting is integral to its religious beliefs. It also offered evidence that it is a religious organization exempt from federal and California income taxes and that a decision of the same superior court which issued the injunction here determined that RSNH is using its property for church purposes within a zoning ordinance.

The trial court rendered a statement of decision. First, it found that certain practices of RSNH constitute the practice of medicine within sec-

tions 2052 and 2053, including diagnostic procedures, physical examinations, advising on physical conditions, and giving advice and counsel on the taking of medications and on fasting, as well as representing that a "water-only fast" can heal or cure illnesses. The court further found that three specific persons, the Pressmans and Roundtree, suffered harm as a result of undertaking fasts supervised by RSNH. Further, the court stated that "the practice of natural hygiene does not require a belief system based on religion." And further, "the water-only fast of [the Pressmans and Mauk] was not a religious experience nor a religious practice, but was solely for therapeutic reasons." The court's judgment then restrained appellants from engaging in the activities found to constitute the practice of medicine. The injunction prohibited activities constituting the unlawful practice of medicine, including but not limited to taking blood pressure or pulse; listening to the heart, chest or lungs with a stethoscope; conducting physical examinations; giving advice or comment on the meaning and significance of physical conditions including but not limited to tongue or breath odor; giving advice or counsel regarding use of medications; advising when to begin or end a fast; representing that fasting can cure illnesses, diseases or physical and mental conditions; supervising water-only fasts; and advertising the offering of such supervised fasts.

The court also awarded costs to the Board, including costs incurred for investigations dating back to 1983.

### DISCUSSION

The issue here is not whether RSNH engaged in activities which constitute the practice of medicine. ██ Ample evidence in the record supports the trial court's findings that they did do so, and they do not challenge those findings.[2]

Nor is there a serious argument made that the injunction infringes appellants' constitutional rights to free exercise of religion under the First Amendment. ██ Cases are legion which hold that freedom of religious belief may be absolute but freedom of action is not (*Cantwell* v. *Connecticut* (1940) 310 U.S. 296, 304 [84 L.Ed.1213, 1218, 60 S.Ct. 900, 128 A.L.R. 1352]). The state may legitimately regulate dangerous conduct regardless of religious content. ██ It is therefore universally held that in the interests of protecting its citizens' health, the state may regulate health treatments which are potentially dangerous to the patient. (Note, *Restrictions on Unor-*

---

[2] The concept of practicing medicine under the California licensing laws is very broad, and any activity customarily performed by a licensed practitioner, such as diagnosis, treatment, or prescribing medications qualifies. (See e.g. Note, *Restrictions on Unorthodox Health Treatment in California* (1977) 24 UCLA L.Rev. 647, 650-651; e.g., *People* v. *Saunders* (1923) 61 Cal.App. 341, 344 [215 P. 120].)

*thodox Health Treatment in California* (1977) 24 UCLA L.Rev. 647, 664; *People* v. *Nunn* (1956) 46 Cal.2d 460, 469 [296 P.2d 813]; *Hewitt* v. *Board of Medical Examiners* (1906) 148 Cal. 590, 592 [84 P. 39]; *Blinder* v. *Division of Narcotic Enforcement* (1972) 25 Cal.App.3d 174, 179-182 [101 Cal.Rptr. 635]. See also *Walker* v. *Superior Court* (1988) 47 Cal.3d 112 [253 Cal.Rptr. 1, 763 P.2d 852] [parent may be prosecuted for involuntary manslaughter and felony child endangerment when her criminal negligence proximately caused her child's death from meningitis after receiving treatment by prayer in lieu of medical attention]; *Jacobson* v. *Massachusetts* (1905) 197 U.S. 11, 39 [49 L.Ed. 643, 655, 25 S.Ct. 358] [compelled vaccination of children despite religious objection]; *United States* v. *Lee* (1982) 455 U.S. 252, 261 [71 L.Ed.2d 127, 134-135, 102 S.Ct. 1051] [compelled participation in social security system despite Amish belief]; *Gillette* v. *United States* (1971) 401 U.S. 437, 462 [28 L.Ed.2d 168, 188, 91 S.Ct. 828] [compelling certain conscientious objectors to submit to conscription in a war perceived as unjust]; and *Reynolds* v. *United States* (1878) 98 U.S. 145, 164 [25 L.Ed. 244, 249-250] [polygamy may be outlawed although it is a basic tenet of the Mormon faith].)

 The United States Supreme Court states the test of secular laws which impinge on religious belief as follows: "[I]f the State regulates conduct by enacting a general law within its power, the purpose and effect of which is to advance the State's secular goals, the statute is valid despite its indirect burden on religious observance unless the State may accomplish its purpose by means which do not impose such a burden." (*Braunfeld* v. *Brown* (1961) 366 U.S. 599, 607 [6 L.Ed.2d 563, 568, 81 S.Ct. 1144].)
 Applying this test to the unauthorized practice of medicine, we conclude in agreement with all the authorities cited above that the state may proscribe that dangerous conduct despite its asserted centrality to a religious creed. It cannot seriously be argued that the State of California lacks the power to regulate the practice of medicine in the interest of public safety. (See also *Savelli* v. *Board of Medical Examiners* (1964) 229 Cal.App.2d 124 [40 Cal.Rptr. 171]; *Shea* v. *Board of Medical Examiners* (1978) 81 Cal.App.3d 564 [146 Cal.Rptr. 653].) In other states, many decisions have so held. (E.g. *Fealy* v. *City of Birmingham* (1916) 15 Ala.App. 367 [73 So. 296]; *Smith* v. *People* (1911) 51 Colo. 270 [117 P. 612]; *State* v. *Verbon* (1932) 167 Wash. 140 [8 P.2d 1083]; *State* v. *Harrison* (1951) 260 Wis. 89 [50 N.W.2d 38].)

Accordingly we find no constitutional issue of free exercise of religion in this case. The issue is rather the scope of the exemption provided by section 2063. Assuming, arguendo, that the fasting practices of RSNH constitute the practice of religion, are these practices ipso facto exempt under the statute which prevents regulation which would "interfere in any way with the practice of religion?"

One case to date has construed the scope of this exemption and has held, in a prosecution for practicing midwifery without a certificate, that where such practice was pursuant to a bona fide tenet of a religious faith, the exemption applied. (*Northrup* v. *Superior Court, supra,* 192 Cal.App.3d 276.) *Northrup*'s reasoning was that a literal reading of the statute required this result. (*Id.* at p. 283.) The court said "From the face of the statute, it is clear the Legislature determined that in the licensing context, the state's interests are subservient to its citizens' religious beliefs." (*Ibid.*) No other argument, no citation to legislative history or other authority, was presented to justify the proposition that the legislature intended by this exemption statute to provide a greater degree of freedom for the exercise of religious beliefs than is afforded by the Constitution itself. This result was reached in the face of the demonstrated dangerousness of the practices which the State sought to regulate; the record in *Northrup* showed that two of the three deliveries involved had resulted in stillbirths.

With due respect, we believe it is far from clear that the Legislature intended by this exemption statute to offer special protection to dangerous medical practices. First, there is no evidence that this statute was meant to confer protection for religious practices beyond that already conferred by the free exercise clause of the United States Constitution. The absence of any such evidence is itself persuasive of the contrary conclusion. This is so because to confer such extraordinary protection by means of the unusual route of an exemption from a licensing scheme would be a remarkable exercise of legislative power. ■ Statutes conferring exemptions from regulatory schemes are narrowly construed. (*S. E. C.* v. *Ralston Purina Co.* (1953) 346 U.S. 119, 126 [97 L.Ed. 1494, 1499, 73 S.Ct. 981]; *Securities and Exchange Com'n* v. *Sunbeam Gold M. Co.* (9th Cir. 1938) 95 F.2d 699; *Pollok* v. *Commonwealth* (1976) 217 Va. 411 [229 S.E.2d 858, 860]; *Alpha Therapeutic Corp.* v. *County of Los Angeles* (1986) 179 Cal.App.3d 265, 270 [224 Cal.Rptr. 498] [exemptions from taxation].) They are not normally sources of extraordinary constitutional guaranties.

■ Indeed, to construe the statute as providing such an exemption, in violation of public policy solely to further religious interests, might well amount to conferring a direct governmental benefit on religion in violation of the establishment clause of the First Amendment which proscribes governmental sponsorship or subsidy of religious practices. (See *Corporation of Presiding Bishop* v. *Amos* (1987) 483 U.S. 327, 329-330 [97 L.Ed.2d 273, 279, 107 S.Ct. 2862]; *Walz* v. *Tax Commission* (1970) 397 U.S. 664 [25 L.Ed.2d 697, 90 S.Ct. 1409]; *Lemon* v. *Kurtzman* (1971) 403 U.S. 602, 612 [29 L.Ed.2d 745, 755, 91 S.Ct. 2105].)

Protection of religious belief against secular interference has been peculiarly the province of Constitutions in our political history; this protection is

rooted in the 18th century philosophy of separation of church and state, which the establishment and free exercise clauses of the First Amendment reflect. (See e.g. Mansfield, *The Religion Clauses of the First Amendment and the Philosophy of the Constitution* (1984) 72 Cal.L.Rev. 847, 848-849, 856-858, 903.) In regulating the balance between government and religion, "what finally is at stake is the substantive content of the constitutional ideology. To it ultimately all questions must be referred." (Mansfield, *supra*, at p. 903.) Interpretation of the constitutional guaranty is fundamentally the responsibility of the judiciary, particularly of the United States Supreme Court. (See e.g. Sheffer, *The U.S. Supreme Court and the Free Exercise Clause* (1981) 23 J.Church & State 533, 535: "Any legal definition of free exercise, if one is even possible, will come from the Supreme Court.") One does not expect to find in a general statute, much less in a narrow exemption from medical licensing provisions, a different, independent guarantee of religious freedom, over and above that already inherent in the structure of our government, set out in the Bill of Rights, and interpreted and applied by the judiciary. Had the Legislature intended to confer such unusual protection in so peculiar a fashion as by the route of an exemption statute in the Medical Practice Act, surely it would have left some trace of that intention. The most reasonable deduction from the absence of any such trace is that the exemption statute is no more than a reflection and acknowledgement of constitutional doctrine.

The California Constitution does not confer greater protection upon religious practices than does the federal Constitution and in fact provides *less* protection: "Free exercise and enjoyment of religion without discrimination or preference are guaranteed. *This liberty of conscience does not excuse acts that are licentious or inconsistent with the peace or safety of the State. . . .*" (Cal. Const., art. I, § 4, italics added.) Arguably an exemption from the licensing law for dangerous religious practices violates this constitutional provision, since such activities are inconsistent with the safety of the state in presenting a threat to the health of its inhabitants.

A commentator on the exemption in question notes that the California Constitution defines freedom of religion more narrowly than does the First Amendment and further states that the exemption statute applies only to "faith healers" who use prayer or other nonmedical procedures. (See Note, *Religious Beliefs and the Criminal Justice System* (1975) 8 Loyola L.Rev. 396, 401-402, 416.) The author also observes that persons who hold themselves out as having special scientific knowledge, outside the realm of ordinary experience, must be subject to regulation for protection of the public, and may not seek the immunity afforded to faith healers who rely only on the power of God for a cure and not on particular physical practices. (Note, 8 Loyola L.Rev., *supra*, at p. 418.) Therefore the author believes that the exemption applies only to a genuine faith healer: "The faith healer, so long

as he confines his activities strictly to prayer, is not regulated. The 'faith' is, and should be, unrestricted. The 'healing,' however, may be regulated as soon as it takes on any appearance of medical practice." (*Id.* at p. 430; accord, Note, 24 UCLA L.Rev., *supra,* at pp. 647, 695: "The licensing laws prevent the unlicensed from administering any form of treatment.")

We agree. Here what is involved is not faith healing but the practice of medicine, and therefore the exemption does not apply. The record here is replete with examples of appellants' conduct in purporting to have special knowledge of the body's physical symptoms and needs and further undertaking to diagnose ailments and to prescribe treatment for those ills. The conduct and the treatment goes far beyond prayer and reliance on divine intervention.

We do not agree with the *Northrup* court that the phrase "interfere in any way with the practice of religion" has any greater or different meaning than the free exercise clause of the First Amendment as it has been interpreted by the judiciary. That protection clearly does not extend to dangerous religious practices including unauthorized practice of medicine. Appellants can find no case other than *Northrup* which holds that there is an exemption for dangerous practices based on religious belief.[3]

The People argue that we need not disagree with *Northrup* to decide this case because a point of distinction from *Northrup* is the presence in this case of evidence that the medical practices employed were not bona fide expressions of religion, whereas in *Northrup* the court noted there was no evidence that the church there was not genuine nor that midwifery of the sort there practiced was not genuinely integral to the belief. The *Northrup* court pointed out that if a religious practice contention were false and asserted solely to avoid the licensing requirements the exemption would not apply. (See also *People* v. *Cosper* (1926) 76 Cal.App. 597, 600 [245 P. 466] [no exemption for prayer healing where the record showed that prayer was a mere subterfuge to escape regulation].) We agree that the exemption does not apply to religious practices that are not bona fide. Also it is true that here, unlike *Northrup,* there is evidence that the victims did not come to appellants for religious purposes but to have their physical ailments treated. Thus this record would support a finding that the medical practices were not promulgated for true religious purposes.

---

[3]The closest they come to a citation for the proposition that dangerous religious practices may not be regulated is *People* v. *Woody* (1964) 61 Cal.2d 716 [40 Cal.Rptr. 69, 394 P.2d 813], finding use of peyote by the Native American Church a protected activity despite its illegality. The court there balanced the danger of the use of the drug against the central importance of its use to the religion involved. The case is not comparable to our case since the showing of dangerousness was pretty much limited to demonstrating that use of the substance was illegal.

Unfortunately, we have no such unambiguous finding. The trial court did not plainly say that the medical practices here are not bona fide religious practices. There is the rather cryptic finding that "the practice of natural hygiene does not require a belief system based on religion." That finding is followed by the finding that the fasts of three victims were not religious experiences nor religious practices but were solely for therapeutic reasons. That finding comes close to saying that appellants engaged in these practices not for basic religious purposes but to avoid the licensing restrictions, but it does not precisely say so. We hesitate to premise our judgment solely on the proposition that the practices of appellants here were not bona fide expressions of religion absent an unambiguous finding to that effect by the trial court.

It is our conclusion that upon the facts presented by this record, the court had the power to enjoin appellants from engaging in the unauthorized practice of medicine, as it did. There is no question that the described activities constitute the practice of medicine; that the Board has a substantial interest in preventing such activities, which are demonstrably harmful on this record; that there is no constitutional protection for such activities; and that there is no exemption for such activity, either because the exemption does not purport to go beyond the constitutional protection for freedom of religion, or alternatively because the record does not show that these practices are basic or central to a religion. In reaching this decision we do not deem it necessary to question the bona fides of appellant Andrews' religious faith; that fact is not relevant. Similarly irrelevant is the existence of tax exemptions for the RSNH. Whether RSNH is exempt from taxation is not the issue; the only issue is whether it is exempt from the medical licensing law. We hold that it is not. The Board may obtain an injunction preventing appellants from practicing medicine without a license.

Appellants' remaining arguments do not merit extended discussion. Their argument that the record does not support the finding of a compelling state interest justifying this injunction is unsupported by relevant authority and is remarkable in its statement that the trial court "merely suggested that two witnesses suffered harm." In light of the fact, on the record, that one of the victims died, we think the evidence sufficient in this regard.

The claim that the injunction is overbroad is unaccompanied by a showing of a narrower order that would serve the purpose of preventing unauthorized practice of medicine. That conduct, and no other, is what the judgment enjoins. Appellants say that the court might have required RSNH to limit its membership to consenting adults and require them to sign a disclosure form. ■ The law does not exempt from the licensing requirements medical practitioners who obtain consent forms. There is no license to practice medicine in an unapproved fashion, although individuals may

indeed refuse treatment, as appellants argue. (Citing *Bouvia* v. *Superior Court* (1986) 179 Cal.App.3d 1127 [225 Cal.Rptr. 297].) The court's judgment does not infringe on the right of an adult to self-determination in choice of medical treatment. It restrains unauthorized practice of medicine, a wholly different proposition.

■ Nor does any authority give a right of privacy to activities such as those engaged in on this record. The right of an individual to privacy does not encompass any right to diagnose or treat other individuals.

The contention that the injunction cannot be based on past conduct is frivolous. If not on such evidence, on what could it be based?

Finally there is no showing of abuse of discretion in awarding costs as authorized by statute. There is no necessary reason why an investigation begun in 1983 would not be germane to a petition for an injunction filed in 1986. No evidence in this record other than self-serving assertions by appellants shows that the investigative costs of Board were not legitimately incurred.

We conclude that the judgment granting an injunction is proper and it is affirmed.

Brauer, Acting P. J., and Premo, J., concurred.

A petition for a rehearing was denied July 21, 1989, and appellants' petition for review by the Supreme Court was denied September 28, 1989.