*885 CROSKEY, J., Concurring and Dissenting.
I respectfully disagree with my colleagues’ refusal to address the important question of whether the Department of Managed Health Care (DMHC), prior to the operative date of the applied behavior analysis statute (Health & Saf. Code, § 1374.73 (the ABA statute)), could properly deny plan coverage for autism therapy provided by unlicensed persons. They do so on the stated ground that the issue was not raised in the trial court by Consumer Watchdog. This is totally contrary to the record in this matter and it makes a real difference in the relief to which Consumer Watchdog is entitled. Moreover, the issue of licensure with respect to the provision of autism therapy is a seriously disputed and important issue and, apart from the ABA statute (which has a sunset clause), has not been addressed by the Legislature.
Since Consumer Watchdog’s petition[1] was initially filed in this action on June 30, 2009, the parties have fully litigated the issue of whether the law prior to the operative date of the ABA statute (Health & Saf. Code, § 1374.73, operative July 1, 2012) permitted DMHC to uphold a denial of coverage for ABA[2] to be provided or supervised by a BACB-certified therapist[3] on the basis that such therapist was not licensed. Indeed, it was the sole issue briefed by the parties on appeal until such time as this court, on its own motion, suggested the possibility that the ABA statute may have mooted any claims for prospective relief. Following our initial oral argument, which was limited to the issue of mootness, we were persuaded that the matter was not moot. We then set the case on calendar for argument on the merits, permitted additional briefing and, in fact, invited amicus curiae briefs on those issues raised by the parties’ original briefing (primarily relating to the impact of the licensure laws on the provision of ABA therapy by unlicensed BACB-certified therapists), which the majority opinion has now concluded we have no basis to reach or discuss.
After substantial briefing, and a second oral argument, we resolved those issues, concluding that, prior to the operative date of the ABA statute, BACB-certified therapists were engaging in the unlicensed practice of medicine or, more specifically, the psychology subpractice thereof. We therefore held that DMHC had properly upheld denials of coverage, prior to July 1, 2012, on that basis. In response to a petition for rehearing, which challenged the merits of our resolution of the licensure issues, but not the procedural *886 basis for doing so, the majority now concludes that, in fact, those issues were not properly before this court, and therefore now declines to address them.
In my view, this court should not avoid reaching issues which were in fact (1) raised by Consumer Watchdog’s 2009 petition, (2) litigated by the parties and (3) the principal subject on which the parties’ specifically sought appellate guidance. Thus, while I concur with the majority’s conclusion that the ABA statute constitutes an effective “license” for BACB-certified practitioners from the date it became operative (July 1, 2012),[4] I respectfully dissent from that portion of the opinion which declines to address whether BACB-certified practitioners were required to hold a professional license sufficient to allow them to perform such services prior to July 1, 2012. The majority opinion’s rationale for declining to either consider or resolve the existence of this critical question is not supported by the record in this matter.
1. The Issue Is Properly Before This Court
There are three important reasons why the majority opinion’s embrace of judicial impotency should be rejected in this case. First, Consumer Watchdog’s petition clearly sought resolution of the issue as to whether the law prior to the operative date of the ABA statute required DMHC to order plans to provide coverage for the medically necessary services of unlicensed but BACB-certified practitioners of ABA. Second, the issue was fully litigated by the parties and amici curiae. Third, after we issued our opinion addressing the issue, no party or amicus curiae argued or even suggested that the issue was not properly before the court.
a. Consumer Watchdog’s Petition Raised the Issue
There are two bases for my conclusion that Consumer Watchdog’s petition did in fact raise this issue. First, Consumer Watchdog clearly sought relief from the date of its petition. Second, Consumer Watchdog’s petition sounded in equity, seeking declaratory relief, and the courts are therefore required to resolve all outstanding issues between the parties.
In its first amended petition, Consumer Watchdog alleged that, by failing to compel plans within its jurisdiction to provide coverage for ABA therapy provided or supervised by an unlicensed but BACB-certified practitioner, DMHC “ha[d] violated, and will continue to violate, [its] clear, present, and mandatory duty” to enforce the Knox-Keene Health Care Service Plan Act of *887 1975 (Knox-Keene; Health & Saf. Code, § 1340 et seq.) and the Mental Health Parity Act (MHPA; Health & Saf. Code, § 1374.72). Consumer Watchdog alleged that “in all cases in which an enrollee” has filed a grievance regarding the denial of such ABA, DMHC had a duty to order the enrollee’s plan to either promptly offer and provide the ABA or promptly reimburse the enrollee for the reasonable cost of the ABA. Consumer Watchdog went on to assert that issuance of a writ would be necessary to “ensure that autistic children receive critically needed ABA therapy. And time is of the essence in providing for the delivery of ABA, as the medical evidence conclusively demonstrates that early and consistent ABA therapy is most effective.” The prayer for relief sought a writ of mandate directing that “[i]n response to any enrollee complaint or grievance regarding a health plan’s decision to deny ABA treatment to an autistic enrollee on the ground that it is not a covered benefit, [DMHC] shall ‘order’ the plan—where ABA is both medically necessary and is provided by a . . . provider that is certified by a professional organization, or individuals who are supervised by a . . . certified provider—to either ‘promptly offer and provide’ ABA to the enrollee, or to ‘promptly reimburse’ the enrollee for ‘any reasonable costs’ associated with obtaining ABA, whichever is applicable.”
Consumer Watchdog alleged that the DMHC was, at the time, violating its statutory duty. It further alleged that time was of the essence. It therefore should be obvious that Consumer Watchdog intended to seek relief with respect to all grievances filed after the date of the filing of its petition.[5] (Cf. Morris v. Noguchi (1983) 141 Cal.App.3d 520, 523 [190 Cal.Rptr. 347] [when a party seeks mandate, it argues that it is entitled to relief at the institution of proceedings].) I would therefore conclude that this record plainly demonstrates that Consumer Watchdog did seek relief with respect to a class of grievances which predated the operative date of the ABA statute— those which arose after the commencement of this action.[6]
Moreover, the operative pleadings stated a cause of action seeking declaratory relief, regarding “the obligations and duties of [DMHC] under the *888 [MHPA], [Knox-Keene], and their implementing regulations” with respect whether ABA must be covered when provided or supervised by a BACBcertified individual. “In actions for declaratory relief, the court should attempt to do complete equity, resolving all questions actually involved in the case as between all of the respective parties. [Citation.]” (Amerson v. Christman (1968) 261 Cal.App.2d 811, 823 [68 Cal.Rptr. 378].) “It is the duty of the court hearing the action for declaratory relief to make a complete determination and disposition of the controversy.” (Ibid.) The majority has narrowly construed Consumer Watchdog’s petition, holding that the failure to specifically seek “retroactive” relief bars our consideration of whether DMHC properly resolved any grievances in the past. But “in an action for declaratory relief the rights of the parties are to be determined upon the facts found and are not limited by the issues joined or by claims of counsel.” (Id. at p. 824.) “An action for declaratory relief is equitable, and a court of equity will administer complete relief when it assumes jurisdiction of a controversy. [Citation.] Hence, in such an action it is proper for the court to grant any relief consistent with the evidence and the issues embraced by the pleadings. [Citations.]” (Westerholm v. 20th Century Ins. Co. (1976) 58 Cal.App.3d 628, 632, fn. 1 [130 Cal.Rptr. 164].) “In an action seeking declaratory relief the court must do complete justice, even though it extend beyond the technical reach of the pleadings. [Citations.]” (Bisno v. Sax (1959) 175 Cal.App.2d 714, 731 [346 P.2d 814].) Thus, while I do believe Consumer Watchdog’s petition did seek relief from the date of the commencement of the action, even if it had not, principles of equity require that this court address and resolve the issue as to the resolution of plan grievances arising on or after June 30, 2009, but prior to July 1, 2012, as part of the declaratory relief cause of action. That question was an integral part of the controversy between the parties.
b. The Issue Was Fully Litigated
The issue of whether the law, prior to the operative date of the ABA statute, required DMHC to order plans within its jurisdiction to cover ABA when it was to be provided, or supervised, by a BACB-certified individual, irrespective of whether the therapist possessed a license authorizing the therapist to provide such therapy, was fully litigated before the trial court. Indeed, as the ABA statute was not enacted until, after the trial court’s judgment, it was the sole issue litigated before the trial court.[7]
The initial briefing on appeal followed the same course, with Consumer Watchdog arguing at length that Knox-Keene and the MHPA require plans to *889 cover medically necessary ABA therapy when provided or supervised by a BACB-certified therapist, regardless of licensure. DMHC responded in kind, arguing that it had no ministerial duty, prior to the operative date of the ABA statute, to compel health plans to provide coverage for ABA treatment provided by unlicensed individuals. I emphasize that this was the dispute presented to this court for resolution.
Upon this court’s initial review of the briefs and record, the court informed counsel that it sought additional briefing on whether the appeal should be dismissed as moot in light of the recent enactment of the ABA statute. In response to our request, Consumer Watchdog argued that the appeal was not moot because the exclusion of Healthy Families Program and Public Employee’ Retirement System (PERS) plans from the scope of the ABA statute meant that those plans were still governed by the law prior to the enactment of the ABA statute. Consumer Watchdog argued, “an actual, live controversy very much still exists with respect to the legal dispute that lies at the heart of this appeal—whether Business and Professions Code section 2052 or any other provision of law requires that behavior analysts who administer medically necessary ABA therapy as a treatment for autistic children must be licensed by the state.” Consumer Watchdog also argued that its prayer for relief was broad enough to encompass a request for reimbursement of ABA-related costs arising from claims which were filed by enrollees and improperly denied while this litigation was pending.
While DMHC took the position that the matter was indeed moot, it was apparent that, at the very least, a controversy remained regarding whether Healthy Families and PERS plans were required to cover ABA provided or supervised by unlicensed BACB-certified providers. We therefore tentatively indicated our belief that the appeal was not moot, set the case for oral argument on the merits, and permitted additional briefing.
The additional briefing followed, in which the parties again argued whether the law prior to the enactment of the ABA statute required licensure for the provision of ABA. This posed a very important but difficult issue, in which many entities had a strong interest, so the court requested amicus curiae briefing. In our letter soliciting amicus curiae briefing, we stated, “this court must determine whether the law prior to [the ABA statute] required the DMHC to order health care providers to provide ABA services which are determined to be medically necessary but are to be provided by practitioners who are unlicensed, but certified by the BACB.” We received amicus curiae briefs from organizations representing ABA practitioners, autism advocates, and the Department of Insurance, all discussing some aspect of this issue. To *890 say that the parties and amici curiae expended a great deal of time, money, and effort briefing this issue would be an understatement.[8]
c. After Our Opinion, Reconsideration Was Sought, But No One Argued That the Issue Was Not Properly Before the Court
This court then issued a unanimous opinion resolving the issue. We concluded that the practice of ABA constituted the practice of medicine— specifically, the subpractice of psychology—and that, prior to the enactment of the ABA statute, BACB-certified practitioners were necessarily engaging in the unlicensed practice of psychology. We also concluded, however, that the enactment of the ABA statute constituted a legislative endorsement of BACB-certification as an equivalent of licensure, but only from July 1, 2012 forward.[9]
There followed the receipt of a petition for rehearing by Consumer Watchdog, and several requests for reconsideration by ABA practitioners. After we granted the petition for rehearing, we accepted further amicus curiae briefing. While we received the input of the parties and many amici curiae on the merits of our opinion, not one of them took the position that the issue of the need for licensure of ABA therapists was not before this court. There were arguments that we should not have reached the specific issue of whether the practice of ABA constituted the practice of psychology, but no suggestion that we should limit our analysis to prospective issues only and therefore not address the state of the law prior to the operative date of the ABA statute. Consumer Watchdog itself made no effort to argue that we should not address this issue, and, indeed, continued to assert that we should. In the conclusion to its response to amicus curiae briefing, Consumer Watchdog stated that we should modify our opinion “and issue a decision holding, inter alia, that even prior to [the ABA statute’s] July 1, 2012, operative date, BACB-certified behavior analysts were not required to be licensed under the Business and Professions Code, and that DMHC violated its ministerial duty by improperly denying coverage for medically necessary ABA administered or supervised by unlicensed BACB-certified behavior analysts.”
*891 d. The Issue Was Raised
The issue of whether the law as it existed prior to the ABA statute required DMHC to order coverage for ABA to be provided or supervised by BACBcertified behavior analysts even though they held no license of any kind was (1) raised by Consumer Watchdog’s petition; (2) fully litigated at trial, and before this court; and (3) never once argued, after our initial opinion was filed, to have been an issue improperly considered and resolved by this court. In short, the issue was clearly raised and should be addressed. My colleagues’ refusal to recognize either the justiciable existence or significance of this important issue is an unfortunate abandonment of a principal appellate obligation: to consider and resolve the issues raised and presented by the parties. I now turn to how I believe this court should resolve that issue.
2. ABA Constitutes the Practice of Medicine
Business and Professions Code section 2052, part of the Medical Practice Act (Bus. & Prof. Code, § 2000 et seq.), provides that “any person who practices or attempts to practice, or who advertises or holds himself or herself out as practicing, any system or mode of treating the sick or afflicted in this state, or who diagnoses, treats, operates for, or prescribes for any ailment, blemish, deformity, disease, disfigurement, disorder, injury, or other physical or mental condition of any person, without having at the time of so doing a valid, unrevoked, or unsuspended certificate as provided in this chapter or without being authorized to perform the act pursuant to a certificate obtained in accordance with some other provision of law is guilty of a [crime].”
This language is very broad, encompassing any person who “treats . . . any . . . physical or mental condition of any person.” The Legislature has enacted several exemptions from the burden of this statute; the language of the exemptions, however, only serves to underline the breadth of the statute. These exemptions include “the domestic administration of family remedies”[10] (Bus. & Prof. Code, § 2058, subd. (a)); the giving of nutritional advice (Bus. & Prof. Code, § 2068); “[Resting and guidance programs in schools” (Bus. & *892 Prof. Code, § 2062); medical students performing medical acts as part of their course of study (Bus. & Prof. Code, § 2064); and the limited practice of alternative and complementary healing arts services, if certain disclosures are made (Bus. & Prof. Code, §§ 2053.5, 2053.6). Indeed, in enacting the latter statutes, governing the practice of alternative and complementary medicine, the Legislature made express findings and declarations stating, “Notwithstanding the widespread utilization of complementary and alternative medical services by Californians, the provision of many of these services may be in technical violation of the Medical Practice Act [citation]. Complementary and alternative health care practitioners could therefore be subject to fines, penalties, and the restriction of their practice under the Medical Practice Act even though there is no demonstration that their practices are harmful to the public, [f] . . . The Legislature intends, by enactment of this act, to allow access by California residents to complementary and alternative health care practitioners who are not providing services that require medical training and credentials. The Legislature further finds that these nonmedical complementary and alternative services do not pose a known risk to the health and safety of California residents, and that restricting access to those services due to technical violations of the Medical Practice Act is not warranted.” (Stats. 2002, ch. 820, § 1, subds. (b) & (c), p. 5227.)
Case law also confirms the necessity of a broad interpretation of the practice of medicine. Business and Professions Code section 2052 “represents a reasonable exercise of the state police power, as the statute was designed to prevent the provision of medical treatment to residents of the state by persons who are inadequately trained or otherwise incompetent to provide such treatment, and who have not subjected themselves to the regulatory regime established by the Medical Practice Act [citation]. Causing or intending an injury is not an element of the offense . . . .” (Hageseth v. Superior Court (2007) 150 Cal.App.4th 1399, 1417 [59 Cal.Rptr.3d 385].) “The state . . . clearly has a strong and demonstrable interest in protecting its citizens from persons who claim some expertise in the healing arts, but whose qualifications have not been established by the receipt of an appropriate certificate.” (Bowland v. Municipal Court, supra, 18 Cal.3d at p. 494.) That the unlicensed practitioner may be competent is no defense. Our system, “in order to assure the protection of the public, requires that a person’s competency be determined by the state and evidenced by a license.” (Magit v. Board of Medical Examiners (1961) 57 Cal.2d 74, 85 [17 Cal.Rptr. 488, 366 P.2d 816].)
It is apparent, then, that the “practice of medicine” is construed very broadly. However, although licensed physicians may practice medicine (Bus. & Prof. Code, § 2051), they are not the only individuals permitted to perform acts which may constitute the practice of medicine. As noted in Business and Professions Code section 2052, if the individual is “authorized to perform the *893 act pursuant to. a certificate obtained in accordance with some other provision of law,” the act will not constitute the unlicensed practice of medicine. This is confirmed by Business and Professions Code section 2061, which provides, “Nothing in this chapter shall be construed as limiting the practice of other persons licensed, certified, or registered under any other provision of law relating to the healing arts when such person is engaged in his or her authorized and licensed practice.”
Numerous such authorizations exist. For example, licensed dentists may practice dentistry (Bus. & Prof. Code, § 1600);-licensed (registered) nurses may practice nursing (Bus. & Prof. Code, § 2732); licensed psychologists may practice psychology (Bus. & Prof. Code, § 2903); licensed chiropractors may practice chiropractic (Bus. & Prof. Code, § 1000); licensed occupational therapists may practice occupational therapy (Bus. & Prof. Code, § 2570.3); licensed physical therapists may practice physical therapy (Bus. & Prof. Code, § 2630); licensed respiratory care practitioners may practice respiratory care (Bus. & Prof. Code, § 3730); licensed speech-language pathologists and audiologists may practice speech-language pathology and audiology (Bus. & Prof. Code, § 2532); licensed acupuncturists may practice acupuncture (Bus. & Prof. Code, § 4937); licensed midwives may practice midwifery (Bus. & Prof. Code, § 2507); and certificated dispensing opticians may fit and adjust spectacles and contact lenses (Bus. & Prof. Code, § 2553). Each of these practitioners is authorized to perform acts which constitute the practice of medicine, as limited by the scope of his or her own license.[11] In short, physicians have broad authority to practice medicine, while every other licensed health professional has a limited license to perform tasks which are within the scope of that license, which were previously within the exclusive province of physicians. (58 Ops.Cal.Atty.Gen. 186, 187 (1975).)
This case is concerned with the provision of ABA therapy. It is DMHC’s argument that it cannot direct plans to provide ABA therapy performed by unlicensed individuals, as to do so would be directing plans to pay for the unlicensed practice of medicine. Given the broad definition of the practice of medicine discussed above, it is not possible to avoid the conclusion that the practice of ABA constitutes the practice of medicine. Consumer Watchdog argues from the premise that ABA constitutes “medically necessary treatment” of autism, within the meaning of the MHPA. But as a practice which *894 attempts to “treat . . . [the] mental condition” of autism, it necessarily constitutes the practice of medicine.[12]
There is some authority, however, suggesting that when an individual is engaging in the unlicensed practice of medicine, it is preferable to characterize the individual as engaging in the unlicensed practice of the particular specialty for which a license is required in order to perform the act in question. (See People v. McCall (2013) 214 Cal.App.4th 1006, 1010-1012 [154 Cal.Rptr.3d 471].)[13] As such, it may be preferable to discuss the unlicensed performance of ABA as the unlicensed practice of the specialty of psychology, rather than simply as the unlicensed practice of medicine.
Business and Professions Code section 2903 prohibits the practice of psychology without a license. “The practice of psychology is defined as rendering or offering to render for a fee to individuals, groups, organizations or the public any psychological service including the application of psychological principles, methods, and procedures of understanding, predicting, and influencing behavior, such as the principles pertaining to learning, perception, motivation, emotions, and interpersonal relationships; and the methods *895 and procedures of interviewing, counseling, psychotherapy, behavior modification, and hypnosis .... [¶] The application of these principles and methods includes, but is not restricted to: diagnosis, prevention, treatment, and amelioration of psychological problems and emotional and mental disorders of individuals and groups.” (Italics added.)
ABA involves the application of psychological methods to influence behavior and can be considered a form of behavior modification. When used as a treatment for autism, it therefore falls within the definition of psychology. As ABA falls solidly within the definition of psychology, its practice by an individual who is not licensed to practice psychology, or permitted to do so by another license, constitutes the unlicensed practice of psychology.[14]
Perhaps in an attempt to avoid the unintended consequence of arguing that BACB-certified practitioners are committing the unlicensed practice of medicine, DMHC makes the novel argument that ABA performed by BACB-certified practitioners is educational, while ABA performed by otherwise licensed individuals is medical treatment. In other words, DMHC argues that whether a practice constitutes a medical treatment depends on the identity of the individual performing the practice. The conclusion finds no support in law or logic.
There are some acts which may be medical or nonmedical depending on the circumstances in which they are performed. Hypnosis, for example, may be used for the purposes of entertainment or self-improvement; it only becomes the practice of psychology when it is used as a method of diagnosis *896 or treatment. (Bus. & Prof. Code, § 2908 [exempting from the prohibition on the unlicensed practice of psychology “persons utilizing hypnotic techniques which offer avocational or vocational self-improvement and do not offer therapy for emotional or mental disorders”];[15] see 54 Ops.Cal.Atty.Gen. 62 (1971).) Massage for the purposes of relaxation does not constitute the practice of medicine (In re Maki (1943) 56 Cal.App.2d 635, 644 [133 P.2d 64]); massage when used to “cure or relieve a certain . . . ailment” is the practice of medicine. (People v. Cantor (1961) 198 Cal.App.2d Supp. 843, Supp. 848 [18 Cal.Rptr. 363].) In each instance, the focus is on the goal of the act—whether it is performed for a medical purpose—not on the identity of the individual performing it. The conclusion makes logical sense. An appendectomy is a medical practice whether performed by a doctor or a short order cook. Similarly, frying an egg would not be transformed into a medical practice if performed by a licensed physician. It is the act itself which is the focus of the inquiry, not the actor. (Cf. Board of Medical Quality Assurance v. Andrews (1989) 211 Cal.App.3d 1346, 1348, 1358 [260 Cal.Rptr. 113] [acts performed by the “Religious School of Natural Hygiene” and its “first minister” indisputably constituted the practice of medicine].)
Thus, while I appreciate DMHC’s concern that its argument that ABA constitutes the practice of medicine may, in fact, prove too much (as DMHC has no interest in affecting the practice of ABA outside the context of when an HMO is requested to cover it), the argument is, in fact, correct. The practice of ABA constitutes the practice of medicine, specifically, the practice of psychology. It follows, that, prior to the operative date of the ABA statute, BACB-certified therapists were engaging in the unlicensed practice of medicine or psychology. Thus, the DMHC’s refusal to order plans to provide coverage for ABA therapy performed prior to July 1, 2012 was entirely correct.
I agree with the majority that the enactment of the ABA statute constitutes effective licensure of BACB-certified individuals[16] and that, therefore, even plans excluded from the scope of the ABA statute (Healthy Families and PERS) can no longer (i.e., after My 1, 2012) deny coverage on the ground *897 that ABA provided or supervised by BACB-certified practitioners constitutes the unlicensed practice of medicine or psychology. However, prior to the operative date of the ABA statute, practitioners of ABA who did not hold a license which permitted them to practice ABA were clearly engaging in the unlicensed practice of psychology (an undisputed subpractice of the practice of medicine). Thus, DMHC cannot be considered to have had a ministerial duty to direct any health plan under its jurisdiction to provide coverage to plan enrollees for such therapy prior to July 1, 2012.
However, due to the majority’s construction of Consumer Watchdog’s petition as seeking only relief that is prospective from the date of the final resolution of this action, any relief will apply only to grievances filed on behalf of autistic enrollees in Healthy Families and PERS plans after this litigation is finally resolved and a writ has issued. As I believe the issue of whether DMHC was required to order plans to provide coverage for ABA provided or supervised by BACB-certified practitioners from the date of the filing of the petition is properly before this court, I would grant such relief for autistic children in Healthy Families and PERS plans with respect to any grievance filed for ABA which was to be provided or supervised by BACBcertified practitioners from the July 1, 2012 operative date of the ABA statute onward. For that reason, I concur in part and dissent in part.

 Unless the context otherwise requires, I use the term “petition” to refer to the petition for writ of mandate and complaint for declaratory relief and injunction filed by Consumer Watchdog on June 30, 2009.

 I use the acronym “ABA” in the same sense as it is defined and used in the majority opinion—an intensive form of therapy which has had documented success in treating the symptoms of autism in young children and which is more formally known as applied behavior analysis.

 As stated in the majority opinion, “BACB” refers to the Behavior Analyst Certification Board, a private organization that certifies therapists as qualified to provide ABA therapy.

 As the majority opinion’s analysis is limited to prospective relief sought by Consumer Watchdog, the majority grants Consumer Watchdog relief from the date of the final judgment to be entered in this case, and not from the operative date of the ABA statute. (See 8 Witkin, Cal. Procedure (5th ed. 2008) Extraordinary Writs, § 205, p. 1108.)

 Indeed, it certainly cannot be true that Consumer Watchdog, which filed its complaint on June 30, 2009, intended to seek relief for autistic children beginning only in 2014 or later. Nonetheless, that is the unfair and unjust result now forced upon them by the majority opinion’s abdication of its responsibility to decide the issues that have, in fact, been properly presented to this court.

 I do agree with the majority that the language of the complaint in no way sought retroactive relief (i.e., relief respecting grievances filed prior to June 30, 2009). There is nothing in the prayer seeking the reopening of already resolved grievances, and, indeed, no allegation that DMHC had a clear, present, and mandatory duty to reopen any wrongly resolved grievances. However, the fact that the petition sought only prospective relief does not mean that the petition sought prospective relief from the date of any writ ultimately to be issued. Instead, we should review the language of the petition to determine whether Consumer Watchdog sought relief from the date it was filed.

 The majority opinion suggests that, because Consumer Watchdog did not specifically ask the trial court for retroactive relief, it is therefore raising a new issue on appeal. But the legal issue of DMHC’s obligation under the law prior to the ABA statute was raised before the trial court and is precisely the legal issue being raised here.

 That the parties sought judicial resolution of this dispute is clear. There is also evidence that the Legislature desired a judicial resolution of the dispute. At an Assembly Health Committee hearing on Senate Bill No. 946 (2011-2012 Reg. Sess.), the bill which would become the ABA statute, Senator Steinberg, the author of the bill, stated, “this bill certainly has no intention to interfere with any existing litigation. Those cases should stand on their own.” While Senator Steinberg indicated a personal belief that ABA therapy was required under then current law, he recognized it was a matter of dispute. Senator Steinberg stated that there was no intent for the ABA statute to make any comment about whether ABA was required under then existing law; the ABA statute was intended only to provide immediate coverage.

 This statute, by its terms, expires on January 1, 2017, and therefore does not represent a final legislative resolution of this issue.

 In Bowland v. Municipal Court (1976) 18 Cal.3d 479 [134 Cal.Rptr. 630, 556 P.2d 1081], a defendant charged with the unlicensed practice of medicine argued that the statute was unconstitutionally vague, as it is unclear whether the statute forbids such conduct as “the statement by an unlicensed person to a friend that the friend sounds like he has a cold; the suggestion that a grief be assuaged by a long trip; or advice by an unlicensed person that one suffering from a cold administer to himself aspirin and orange juice.” (Id. at p. 491.) Our Supreme Court did not hold that these hypothetical do not constitute the practice of medicine. Instead, it suggested that “[i]nformal recommendation among friends as to the efficacy of nonprescription vitamin compounds or ocean cruises seems akin to sharing a ‘family remedy under the precursor statute to Business and Professions Code section 2058, subdivision (a). (Bowland v. Municipal Court, supra, 18 Cal.3d at p. 492.)

 Indeed, in some cases, the statutory scheme providing for the licensure of such professionals expressly states that they are not licensed to practice medicine beyond the practice of their specific healing art. (See, e.g., Bus. & Prof. Code, §§ 2530.4 [speech-language pathologists and audiologists], 2621 [physical therapists], 3705 [respiratory care practitioners].)

 It should go without saying that policy reasons support a broad construction of Business and Professions Code section 2052 and its inclusion of the practice of ABA. ABA is an intensive behavioral therapy. Frontline practitioners of ABA often spend 26 to 40 hours per week working with a single autistic child of tender years. If performed correctly, ABA can create new brain connections in a child with autism. While this case is concerned with the provision of ABA by BACB-certified practitioners and individuals supervised by BACB-certified practitioners, the prospect that individuals, with no training whatsoever, could offer themselves as ABA practitioners to the parents of autistic children is a matter of legitimate concern. The BACB will not certify an individual as a Board Certified Behavior Analyst unless that person has a master’s degree in a related field, 225 hours of graduate coursework in behavior analysis, substantial supervised experience, and has passed an examination. If ABA does not constitute the practice of medicine, there is nothing to stop untrained and uncertified individuals from calling themselves “Applied Behavior Analysts” and claiming that they can safely practice ABA. It is not difficult to imagine that permanent harm could well result to a vulnerable autistic child from 40 hours per week of intensive behavior therapy provided by someone who is neither trained, tested, nor supervised.

 People v. McCall involved the prosecution of a midwifery student who, while unsupervised, provided prenatal care for a patient, and attended and assisted at a birth, manually guiding the baby out, cutting the umbilical cord, removing the placenta, giving the mother an injection to stop hemorrhaging, and suturing a tear. The defendant argued that she should have been prosecuted for the misdemeanor of the unlicensed practice of midwifery, rather than felony unlicensed practice of medicine. While the Court of Appeal acknowledged the general principle that a specific statute is considered an exception to the general one, it rejected the defendant’s argument, stating that she “may have committed a misdemeanor violation of the Midwifery Act by performing midwife services without the required supervision of a licensed midwife or a physician and surgeon. But she did a great deal more than that. Her conduct above and beyond the failure to secure supervision constituted, as the jury found, practicing medicine without certification, a felony violation of the general statute.” (People v. McCall, supra, 214 Cal.App.4th at p. 1016.)

 An exception to Business and Professions Code section 2903 provides that it shall not prevent “qualified members of other recognized professional groups licensed to practice in the State of California, such as, but not limited to, physicians, clinical social workers, educational psychologists, marriage and family therapists, optometrists, psychiatric technicians, or registered nurses, or attorneys admitted to the California State Bar, ... or duly ordained members of the recognized clergy, or duly ordained religious practitioners from doing work of a psychological nature consistent with the laws governing their respective professions.” (Bus. & Prof. Code, § 2908.) In response to our initial opinion in this case, we received amicus curiae briefing from the California Association of Marriage and Family Therapists, the National Association of Social Workers, and the California Association for Licensed Professional Clinical Counselors, all requesting that we modify our original opinion to confirm that their members could legally practice ABA. Business and Professions Code section 2908 specifically provides that “qualified members of other recognized professional groups licensed to practice in the State of California,” including but not limited to clinical social workers and marriage and family therapists may, in fact, “do[] work of a psychological nature consistent with the laws governing their respective professions.” It is beyond the scope of this opinion to determine which “recognized professional groups licensed to practice” in California may perform ABA “consistent with the laws governing their respective professions.” I simply wish to note that, when I conclude that the practice of ABA constitutes the practice of psychology, this does not mean that I believe that only licensed doctors and psychologists can perform ABA. Any licensed professional whose license permits it may practice ABA.

 The statute also permits hypnosis for medical purposes by a nonpsychologist, if the hypnotist does so by referral from a licensed doctor, dentist, or psychologist. (Bus. & Prof. Code, § 2908.)

 Consumer Watchdog argues that certain statutes and regulations existing prior to the ABA statute constituted effective licensure of BACB-certified individuals. Specifically, it relies on a provision of the Education Code providing that “[a] person recognized by the [BACB] as a Board Certified Behavior Analyst may conduct behavior assessments and provide behavioral intervention services for individuals with exceptional needs.” (Ed. Code, § 56525.) As there is nothing in the statutory scheme defining “behavioral intervention services” to include the provision of ABA to autistic children, this provision is of little aid to Consumer Watchdog. Consumer Watchdog also notes that BACB-certified individuals have been reimbursed by regional centers, under State Department of Developmental Services Regulations which allow *897 BACB-certified vendors to be classified as behavior analysts. (Cal. Code Regs., tit. 17, § 54342.) A regulation allowing reimbursement, however, is not a statutory exception to licensure.